## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Prairie Field Services, LLC,

            Plaintiff,

    v.

Alan Welsh, Alan Gilbertson, Dustin
Drefke, Immense Services, LLC,
Darcy Johnson, Scott Keogh,
Aladdin Financial, Inc., and DJ
Express, Inc.,

            Defendants.

---

Case No.:_____

**COMPLAINT**

Plaintiff Prairie Field Services, LLC ("Prairie"), for its Complaint against

Defendants Alan Welsh, Alan Gilbertson, Dustin Drefke, Immense Services, LLC

("Immense"), Darcy Johnson, Scott Keogh, Aladdin Financial, Inc. ("Aladdin"),

and DJ Express, Inc. ("DJ Express") (collectively "Defendants"), states and

alleges as follows:

## <u>INTRODUCTION</u>

1.     Defendants have stolen Prairie's confidential information and

abused their intimate relationships with Prairie to unfairly compete with it.

2.     Defendants Alan Welsh, Alan Gilbertson, and Dustin Drefke are all

former employees of Prairie.  Welsh was Prairie's Chief Operating Officer,

overseeing Prairie's entire business operations.  Gilbertson and Drefke also had

key roles and access to Prairie's competitive information.  While they were

working for Prairie, Welsh, Gilbertson and Drefke spent months building and planning to divert business to their new company, Immense. Even worse, as they were getting ready to leave Prairie for Immense, Welsh, Gilbertson and Drefke accessed and sent themselves a wealth of confidential information and trade secrets owned by Prairie, including individual customer rate sheets, pricing models, business forecasts, insurance information, employee lists, training guides, and vendor information.

3.      Defendants Darcy Johnson, Scott Keogh, and their companies, Aladdin and DJ Express, assisted and encouraged Welsh, Gilbertson, and Drefke's misconduct. Aladdin is apparently funding Immense. DJ Express is apparently partnering with Immense. And Johnson and Keogh are identified as part of the "management team" for Immense. Johnson, Keogh and their companies are not innocent bystanders. Aladdin has a multi-million-dollar financing relationship with Prairie. Aladdin and its principals knew Welsh, Gilbertson, and Drefke were Prairie employees when they were working together to build a competing business. Aladdin and its principals directly or indirectly helped Welsh, Gilbertson, and Drefke violate their duties to Prairie.

4.      Once Prairie learned about Defendants' conspiracy to unfairly compete with Prairie, Prairie immediately started this action to obtain an

injunction.  Prairie will also seek damages and other financial remedies as the case progresses.

## PARTIES, JURISDICTION, AND VENUE

5.    Prairie is a North Dakota limited liability company with corporate headquarters in Wayzata, Minnesota and operational headquarters in Wyoming and Texas.  Prairie provides logistics and trucking services, primarily for the oil industry.

6.    Alan Welsh is an individual who resides, upon information and belief, in Wyoming or South Dakota.

7.    Alan Gilbertson is an individual who resides, upon information and belief, in Wyoming or North Dakota.

8.    Dustin Drefke is an individual who resides, upon information and belief, in Wyoming.

9.    Immense is a Wyoming limited liability company.  Immense is a trucking company focused on the oil field services industry.  Immense was created by Welsh, Gilbertson, and Drefke while they were still Prairie employees. Upon information and belief, Immense is also affiliated with Darcy Johnson, Scott Keogh, Aladdin and DJ Express.  Immense was built to compete with Prairie in the crude oil transportation business.

3

10.    Darcy Johnson is an individual who, upon information and belief, resides in South Dakota.

11.    Scott Keogh is an individual who, upon information and belief, resides in South Dakota.

12.    Aladdin is a South Dakota corporation co-owned by Johnson and Keogh.  Aladdin provides financing and accounts receivable factoring to trucking companies, including Prairie.  Upon information and belief, Aladdin has also provided financial or other support to Immense.

13.    DJ Express is South Dakota corporation co-owned by Johnson and Keogh.  DJ Express is in the trucking business.  Upon information and belief, DJ Express has partnered with or otherwise supported Immense.

14.    Pursuant to 18 U.S.C. § 1836(c), this Court has subject matter jurisdiction over this action because Prairie is bringing a claim for violation of the federal Defend Trade Secrets Act.

15.    Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in Minnesota, and a substantial part of property that is the subject of the action is located in Minnesota.

16.    This Court has personal jurisdiction over Defendants because: Defendants engaged in tortious conduct that caused harm to Prairie in

Minnesota, where Prairie's corporate headquarters are located; and most of the confidential information and trade secrets Defendants have misappropriated (including pricing models, analytical tools, and databases) were created in Minnesota, are housed on servers maintained in Minnesota, and were therefore taken from Minnesota.

## FACTS

### A.    Prairie's Business

17.    Prairie is a transportation and logistics company.  Prairie's core market is the oil field industry, with a particular emphasis on the Powder River Basin in Wyoming.  Prairie specializes in creating complete end-to-end solutions for companies that need to truck oil and related products from the oil fields in Wyoming, Colorado, New Mexico, and Texas to their destination.

18.    The market for trucking oil and related products is currently heavy on suppliers.  Because there is so much competition, the market is very price-sensitive.  Prairie has been successful because, among other things, it has one of the largest and newest fleets of trucks in Wyoming, good customer relationships, a high-quality, proprietary safety program, and services (e.g., water transportation) that other oil trucking companies do not provide.  While all of these characteristics are important, Prairie's continued success depends on its ability to remain competitive on price.

19.     Companies in the oil services industry bid out transportation services.  When these companies solicit bids, their primary objective is to pay less for trucking so they can decrease operating costs and, by extension, charge lower prices to end users.  In order to win a bid, a company like Prairie usually needs to have the lowest price.  Prairie creates its bids using a confidential pricing model that breaks down the estimated costs of the work (e.g., driver pay, fuel costs, insurance costs, etc.).  The pricing model is based on years of historical data and Prairie's specific knowledge of its customers' needs.  The model is not basic arithmetic.  A competitor could not recreate Prairie's pricing model without inside knowledge of Prairie's confidential information.  If a competitor knew Prairie's pricing model or the prices Prairie charged to its customers, the competitor could easily undercut Prairie's bids and take its customers.

**B.    Welsh, Gilbertson, and Drefke's Employment at Prairie**

20.     In or about March 2016, Welsh started working for Prairie as its Director of Safety.  He was then promoted to Chief Operating Officer, and held that role from approximately September 2018 to September 30, 2020.  In that role, Welsh oversaw Prairie's entire business except for its finances and accounting. (The finances and accounting are managed by Prairie's Chief Financial Officer, Paul Dunn, and its Controller, Matt Wharton, in Minnesota.)

21.     Welsh was ultimately responsible for every aspect of Prairie's operations, including human resources, safety, shop, dispatch, and capital assets (e.g., trucks).  During his time as COO, Welsh led and/or participated in every major initiative at Prairie, from the creation of a new safety program, to the implementation of a new data security program.

22.     Welsh was Prairie's primary salesperson and main contact for Prairie's customers.  After a customer was introduced to Welsh, it was his responsibility to maintain and grow the relationship.

23.     As COO, Welsh had access to most of Prairie's competitive information.  Welsh could obtain copies of Prairie's financial statements and he had input into Prairie's financial projections.  He knows Prairie's pricing, customer and vendor contacts, well locations, and management plans.

24.     Gilbertson worked for Prairie for approximately five years.  When Welsh joined Prairie, he brought Gilbertson into the safety department.  When Welsh was promoted to COO, Gilbertson became Director of Operations so he could continue working with Welsh.  Gilbertson served as Director of Operations until his employment with Prairie terminated the same day this lawsuit started.

25.     As Director of Operations, Gilbertson served as Welsh's righthand man.  Gilbertson, like Welsh, had access to almost all of Prairie's competitive information.  Outside of Prairie's finance and accounting, Gilbertson and Welsh

had greater access to Prairie's sensitive information than anyone in the

organization.  Gilbertson knows about Prairie's financial statements, pricing,

truck registrations and titling, and sales history, among other things.  Gilbertson

also managed Prairie's relationships with third-party contractors.

26.     Drefke was a Dispatch Manager for Prairie for several years.  His

employment with Prairie ended August 22, 2020.

27.     In his capacity as Dispatch Manager, Drefke managed a team of 8-10

people who worked on day-to-day trucking operations.  When oil producers

called in loads that needed to be transported, Drefke's team figured out the most

economic way to get the loads delivered.  Simply put, Drefke's job was to put the

right truck in the right place at the right time.  His role was at the crux of

Prairie's trucking and logistics business.

28.     Due to the nature of his responsibilities, Drefke had access to a wide

range of information about Prairie's business, including individual tickets,

Prairie's truck monitoring system, pricing, and forecasts.  Drefke worked and

signed off on Prairie's confidential pricing model.  He also had copies of Prairie's

confidential bid sheets showing rates for each customer, as well as confidential

monthly forecasts for which he provided data.

C.    **Prairie's Employee Handbook and Internet Usage Policy**

29.    Prairie has an Employee Handbook with company policies all Prairie employees must follow.  During their employment at Prairie, Welsh, Gilbertson, and Drefke each signed a written Employee Handbook Acknowledgment and Receipt, in which they acknowledged receiving Prairie's Employee Handbook and agreed to comply with it.

30.    Prairie's Employee Handbook includes the following Conflicts of Interest policy:

> Prairie Field Services expects all employees to conduct themselves and company business in a manner that reflects the highest standards of ethical conduct, and in accordance with all federal, state, and local laws and regulations.  This includes avoiding real and potential conflicts of interest.
>
> . . .
>
> It is not possible to define all the circumstances and relationships that might create a conflict of interest.  If a situation arises where there is a potential conflict of interest, the employee should discuss this with a manager for advice and guidance on how to proceed. The list below suggests some types of activity that indicate improper behavior, unacceptable personal integrity, or unacceptable ethics:
>
> - Simultaneous employment by another firm that is a competitor of or supplier to Prairie Field Services.
>
> - Carrying on company business with a firm in which the employee, or a close relative of the employee, has a substantial ownership or interest.
>
> - Holding a substantial interest in, or participating in the management of, a firm to which the company makes sales or from which it makes purchases.

. . .

- Using one's position in the company or knowledge of its affairs for personal gains.

. . .

31.    Prairie's Employee Handbook includes the following Confidentiality

policy:

> The protection of confidential business information and trade secrets is vital to the interests and success of Prairie Field Services. Confidential information is any and all information disclosed to or known by you because of employment with the company that is not generally known to people outside the company about its business.
>
> An employee who improperly uses or discloses trade secrets or confidential business information will be subject to disciplinary action up to and including termination of employment and legal action, even if he or she does not actually benefit from the disclosed information.

32.    Prairie's Employee Handbook includes the following Return of

Company Property policy:

> On your last day of employment with Prairie Field Services you agree to return all company property.  This includes any . . . forms or documents not directly related to your employment, and any other item identified as owned by the company in other policies or labelling.

33.    Prairie's Employment Handbook includes the following Computers,

Internet, Email, and Other Resources policy:

> The company encourages employees to use e-mail only to communicate with fellow employees, suppliers, customers, or potential customers regarding company business. . . .

All use of company-provided communications systems, including e-mail and internet use, should conform to our company guidelines/policies, including but not limited to the Equal Opportunity, Harassment, Confidential Information, and Conflicts of Interest.

**D.    Welsh, Gilbertson, and Drefke's Disloyalty**

34.    For the last several months of their employment with Prairie, Welsh, Gilbertson, and Drefke blatantly violated Prairie's company policies and their fiduciary duties to Prairie.  While they were still employed by Prairie, they secretly started and built a competing business, Immense, using their inside knowledge of Prairie.

35.    On June 18, 2020, Welsh, Gilbertson, and Drefke filed organizational documents with the Wyoming Secretary of State in order to incorporate Immense.  But the planning for Immense began well before its formal incorporation.  By June 8, Welsh, Gilbertson, and Drefke had already named the company, and Gilbertson already had an "@immenseservicesllc" email address.

36.    According to its business plan, Immense will provide trucking to the oil field services industry.  An express part of Immense's plan is to establish partnerships with Prairie customers (such as Shell, Pinnacle, True, and Endeavor) and haul oil in the same areas as Prairie (such as Wyoming, Colorado, and Texas).

37.    Welsh, Gilbertson, and Drefke never disclosed the existence of Immense or their involvement in it to their superiors at Prairie.  From the time they started Immense until Prairie's management discovered what they were doing, Welsh, Gilbertson, and Drefke worked to benefit Immense at Prairie's expense.

38.    During their employment at Prairie, Welsh, Gilbertson, and Drefke learned about corporate opportunities for Prairie and diverted them to Immense. For example:

(a)    On August 1, 2020, Welsh, Gilbertson, and Drefke learned about an opportunity for Prairie to haul water equipment for a company named Element Frac.  Welsh then solicited advice from another Prairie employee about how Immense could get that business.

(b)    On September 11, 2020, Welsh and Drefke received an invitation for Prairie to bid on hauling work for Chaco Energy.  One week later, Drefke forwarded the invitation to his Immense email address.

(c)    On September 16, 2020, Shell, a Prairie customer, emailed Welsh at his Prairie email address about a potential business opportunity.  Welsh asked Prairie's CFO, Paul Dunn, to

"confirm" that Prairie was not interested in this business. Dunn responded that he was "inclined to agree," but he wondered if Prairie could "improve[] relations with Shell, and make a few dollars, by taking this on." Although Dunn's email showed Prairie was considering this opportunity, Welsh forwarded the information to his Immense email address anyway.

(d)   On September 18, 2020, Welsh learned about an opportunity for Prairie to bid to haul gas and diesel in partnership with a company named KAG Logistics. Welsh forwarded the information to his Immense email address. Immense then submitted a bid to KAG on September 24. Gilbertson prepared Immense's bid when he and Welsh were still working for Prairie.

(e)   On September 20, 2020, Welsh forwarded contact information for the CFO of a Prairie customer, Grayson Mill Energy, to Welsh's Immense email address.

(f)   On September 22, 2020, Gilbertson, using his Immense email address, sent an email to Drefke at his Prairie address with an attached spreadsheet showing Prairie's recent bid for hauling

work. Gilbertson wrote: "We should have an advantage with our bid." Drefke forwarded the email and attachment to himself at his Immense address.

(g) Recently, Prairie considered hauling products for Amazon. On information and belief, in anticipation of Welsh forming Immense, Welsh failed to follow up on and develop the relationship with Amazon and other non-oil hauling opportunities. Immense and/or DJ Express are now hauling or planning to haul products for Amazon and others.

39. During their employment at Prairie, Welsh, Gilbertson, and Drefke also used their positions to self-deal with Prairie. For example, on July 2, 2020, Gilbertson, on behalf of Prairie, and Drefke, on behalf of Immense, signed a Broker-Motor Carrier Agreement, whereby Prairie agreed to pay Immense for hauling services. The pay rate in the Immense Agreement was higher than Prairie pays for other vendors. Prairie enters into agreements with third party carriers like this only when Prairie is unwilling or unable to haul a shipment. Immense ran two routes for Prairie under this Agreement – routes that Prairie could have run itself. Prairie's upper management did not know about the Agreement when it was signed or performed.

40.     During his employment at Prairie, Welsh recruited multiple Prairie employees to join Immense, implicitly insulting Prairie in the process.  He also gathered lists of Prairie drivers, presumably for the purposes of recruiting them. Upon information and belief, Gilbertson and Drefke helped or encouraged Welsh's recruitment efforts.

### E.      Confidential Information and Trade Secrets Stolen by Welsh, Gilbertson, and Drefke

41.     If the above activities were not bad enough, Welsh, Gilbertson, and Drefke have also misappropriated a wide range of confidential information and trade secrets owned by Prairie, including individual customer rate sheets, pricing models, business forecasts, insurance information, employee lists, training guides, and vendor information.  For example:

(a)     On June 24, 2020, Gilbertson, using his Immense email address, sent Welsh pricing information for Gibson, a Prairie customer.  Welsh then forwarded that information to Drefke.

(b)     On August 24, 2020, two days after Drefke's last day of employment with Prairie, Drefke sent an email from his Prairie email address (which he still had temporary access to in order to help the transition) to his potential replacement at Prairie.  The email attached spreadsheets showing Prairie's monthly forecasting of water and oil barrels Prairie will haul,

fueling needs, available trucks and drivers, and analyses of certain customers.  When Drefke emailed this confidential information to his potential successor, he blind copied his Immense email address and his personal Gmail address, presumably so he could have the documents after his access to Prairie's email system was cutoff.

(c)   On September 4, 2020, Drefke emailed Prairie's insurance information to Welsh and Gilbertson at their Immense email addresses.

(d)   On September 14, 2020, Welsh emailed himself at his Immense address an employee screening invoice with a list of dozens of Prairie drivers and the types and costs of screening they received.

(e)   On September 16, 2020, Welsh emailed himself at his Immense address information about a third-party contractor, CVD. CVD stopped hauling for Prairie a few weeks later.

(f)   On September 17, 2020, Welsh emailed himself at his Immense address information about projected volumes for Prairie's South Texas operations.

(g)     On September 18 and 22, 2020, Drefke used his ongoing access to his Prairie email account to send himself, at his Immense email address, all of the following: information about expected oil loads for Endeavor, a Prairie customer; tank table spreadsheets from Vermillion, a Prairie customer; Prairie's bids submitted to multiple customers; Prairie's rate sheets for multiple customers, including Prairie's largest customers, Sinclair and Wyoming Refining; Prairie's pricing model; and Prairie's latest monthly forecasts.

(h)     Immense's business plan suggests it will also be using the same safety and training program that Welsh, Gilbertson, and/or Drefke created for Prairie.

42.     The information that Welsh, Gilbertson, and Drefke stole is extremely sensitive and valuable.  As explained above, the market for trucking in the oil field industry is highly competitive and price-sensitive.  A competitor's knowledge of Prairie's pricing and price modeling would give it an unfair competitive advantage in bidding for work.  The other information Welsh, Gilbertson, and Drefke took – including information about Prairie's customers, third-party contractors, employees, and training program – is also valuable.  Having this information enables Welsh, Gilbertson, and Drefke to immediately

create a replica of Prairie and capitalize on Prairie's investments, rather than building a new business from the ground up.

43.    The mere fact that Welsh, Gilbertson, and Drefke secretly stole so much information from Prairie as they were building a competing business shows how valuable the information is.  They had no reason to misappropriate Prairie's information unless it would help them compete.

44.    Welsh, Gilbertson, and Drefke knew or should have known the information they took was confidential.  Prairie's customer rate sheets state in plain language: "All pricing information is confidential."  Even without such a label, the information described above is so important to Prairie's business that anyone with knowledge of the market would implicitly understand it is confidential.  Welsh also personally participated in determining who would get access to Prairie's network folders.

45.    Prairie took more than reasonable steps to maintain the confidentiality of its information.  The documents described above are located on Prairie's network or email accounts that are password-protected.  Prairie's Controller, Matt Wharton, also limits access to the company's most sensitive financial data.  Prairie's full rate sheet history and master pricing model is in a folder that only Wharton and Dunn (Prairie's CFO) can view.  Drefke had copies of individual rate sheets and the pricing model only because he received them

via email as part of his job duties at Prairie. The financing and accounting team members are also the only employees with full access to the Prairie's financial details. Welsh and Gilbertson could see the broader financial reports, but they did not have the underlying data unless they specifically requested it and Wharton or Dunn provided it. Suspiciously, Welsh and Gilbertson requested more financial details in the weeks leading up to their departure.

46.    Welsh, Gilbertson, and Drefke knew the information they took was not readily accessible. That is why they stayed at Prairie, requested greater access to Prairie's information, and kept their Prairie email accounts open long after they decided to leave Prairie and build a competitor. By keeping one foot in Prairie's door, Welsh, Gilbertson, and Drefke were able to steal information that they could not have gotten outside of Prairie.

### F.    Johnson, Keogh, Aladdin, and DJ Express's Assistance

47.    Welsh, Gilbertson, and Drefke did not build Immense alone. It would have been practically impossible to make Immense work without the assistance and financial backing of Darcy Johnson, Scott Keogh, and their companies, DJ Express and Aladdin.

48.    DJ Express, which is named after Johnson and co-owned by Johnson and Keogh, provides over-the-road flatbed services. DJ Express employs Drefke's father, Alan Drefke, as its Operations Manager. According to

Immense's business plan, DJ Express and Immense are partners in the trucking business.

49.     Aladdin, another company that Johnson and Keogh co-own, provides financing and accounts receivable factoring to trucking companies, including Prairie. Prairie has paid Aladdin millions of dollars over the years, only to have Aladdin help Prairie's new competitor, Immense. Aladdin, Johnson and Keogh are all identified in Immense's business plan as part of the "management team" for Immense. Upon information and belief, they are also financing Immense.

50.     In or about the late spring or early summer 2020, Welsh visited Johnson. Upon information and belief, they talked about their new business venture and the role that Johnson, DJ Express and Aladdin would play in that venture. After one visit to Johnson, Welsh had the audacity to submit one of his trip expenses to Prairie for reimbursement.

51.     On August 17, 2020, Alan Drefke (Drefke's father) introduced an insurance broker to Welsh and Drefke via email. Alan Drefke wrote that Welsh and Drefke "will both be a part of DJ [Express] in the near future. They also have a start-up company [Immense] they are working on and will be needing insurance for. Scott [Keogh] and Darcy [Johnson] are also involved in this other company."

52.     On August 23, 2020, Welsh worked on summary of Immense's business to share with insurance companies.  He wrote: "Though small at this time, Immense Services is a partner company with DJ Trucking and has strong financial backing."  Upon information and belief, Immense's "strong financial backing" comes from Johnson, Keogh and/or Aladdin.

53.     While Aladdin, Johnson and Keogh were working behind the scenes to help Prairie's new competitor, Immense, they were also exerting financial pressure on Prairie.  Aladdin provides two forms of financing to Prairie: factoring advances; and a line of credit.  Prairie depends on this financing for cash flow needs.

54.     In mid-July 2019, after Immense was created, Keogh emailed Prairie to say he and Johnson were unhappy that Prairie's factoring volume had decreased while Prairie's line of credit borrowing (which had a lower interest rate) had increased.  Nothing in the parties' agreements prohibited the actions Keogh complained about, but Keogh threatened to terminate Prairie's factoring agreement unless Prairie made some immediate concessions.  In order to satisfy Keogh's demands, Prairie quickly pulled together over $700,000 to pay off its line of credit.  Upon information and belief, the financial pressure Aladdin, Keogh, and Johnson applied to Prairie at this time was influenced by their involvement in Immense, or vice versa.  Upon information and belief, if Aladdin takes any

additional action to restrict or terminate Prairie's financing when Prairie is not in default, it will be further evidence of Aladdin's intent to damage Prairie to the benefit of Immense and/or DJ Trucking.

### G. Termination of Welsh, Gilbertson, and Drefke

55.    While they worked for Prairie, Welsh, Gilbertson, and Drefke made efforts to hide their competitive activities and plans for Immense.

56.    In late August 2020, just as Immense was being incorporated, Welsh told Prairie's CEO, Pat Hughes, that he was "burned out" and needed to move on.  Welsh promised to stay on through September to help with the transition. Almost immediately after Welsh announced his intention to resign, Drefke announced that he was also leaving Prairie.  Drefke said he was going to work with his dad at DJ Express.  Neither Welsh nor Drefke said anything about Immense.  Meanwhile, Gilbertson continued working for Prairie and said nothing at all about any plan to leave.

57.    In late August 2020, Hughes heard a rumor that Welsh was going to partner with Darcy Johnson and compete with Prairie.  Hughes then sent a text message to Welsh, asking him about the rumor.  Welsh responded that the rumor was not true, saying he was going to work for C & S, a trucking management company in South Dakota.  In subsequent conversations, Welsh reiterated that he

was not going to work with Johnson, and that C & S was a small business that dealt only in safety and licensing, not the trucking work that Prairie does.

58.    On August 24, 2020, Welsh sent an email to Hughes and multiple Prairie managers, in which he again lied about his intentions and tried to reassure everyone that he was not out to harm Prairie.  Welsh wrote that "I have decided to take a position in Sioux Falls with C and S Licensing," "I have always felt a close relationship with Pat and want to see Prairie succeed," "Dustin [Drefke] will be leaving as well to take a job working with his dad," and "Rumors fly at times like this and we should all be united in our message."

59.    On October 2, 2020, two days after Welsh's last day, Prairie's management finally learned what Welsh, Gilbertson and Drefke were truly up to for the last several months.  A Prairie employee who had been recruited by Welsh decided to blow the whistle.

60.    When Hughes, Dunn, and Wharton heard about Immense and Welsh, Gilbertson, and Drefke's involvement in the company, they began to investigate.  They searched Welsh's, Gilbertson's, and Drefke's Prairie emails and found the documents summarized above, including Immense's business plans and Prairie's confidential and trade secret information that Welsh, Gilbertson, and Drefke emailed to their Immense email accounts.

61.     In addition to uncovering Welsh, Gilbertson, and Drefke's secret plans, Prairie learned the extent to which they abused Prairie's trust. For example, Drefke's last day at Prairie was August 22, 2020, but he was granted access to his Prairie email account through September 30 with the understanding that he would use that access to help Prairie with the transition. Instead, Drefke used his ongoing access to secretly misappropriate Prairie's confidential information and trade secrets. Before his Prairie email was cutoff, Drefke tried to permanently delete his Immense emails to cover his tracks. However, Drefke apparently did not realize that, even when a Prairie email user deletes an email and empties the trash, the email can be recovered for 30 days. As Prairie was reviewing Drefke's email account, it recovered emails that Drefke had tried to delete in the last 30 days – and found all of the Immense emails listed above that Drefke wanted to hide.

62.     Once Defendants' conduct came to light, Prairie immediately engaged legal counsel to start this action. Prairie also terminated Gilbertson's employment, as he was the only one of the conspirators who worked for Prairie beyond September 30, 2020.

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS
## UNDER FEDERAL DEFEND TRADE SECRETS ACT
### (Welsh, Gilbertson, Drefke, Immense)

63.     Prairie restates and incorporates by reference all preceding

allegations as though fully set forth herein.

64.     The federal Defend Trade Secrets Act, 18 U.S.C. § 1836, grants an

owner of a misappropriated trade secret the right to bring a civil action in federal

court if the trade secret is related to a product or service used in, or intended for

use in, interstate commerce.  The trade secrets described below relate to Prairie's

trucking services, which are used in interstate commerce.  Indeed, Prairie

transports crude oil across state lines as part of its regular business activities.

The trade secrets themselves refer to customers and operations in multiple states.

In addition, Welsh, Gilbertson, Drefke and Immense took Prairie's trade secrets

across state lines.  The information was originally housed on servers maintained

in Minnesota.  While Welsh, Gilbertson, and Drefke were still employees of

Prairie, they took Prairie's trade secrets from Prairie's servers and emailed it to

themselves at their Immense email addresses for the purposes of using it for

Immense or other business in Wyoming, South Dakota, and elsewhere.

65.     Welsh, Gilbertson, Drefke and Immense have misappropriated trade

secrets owned by Prairie, including but not limited to: individual customer rate

sheets, pricing models, business forecasts, insurance information, employee lists,

training guides, and vendor information.  Prairie took reasonable steps to keep

this information confidential by marking certain documents "confidential,"

limiting access to the documents, and password protecting the network and

email accounts where the documents are located.  This information has actual or

potential economic value from not being generally known or readily

ascertainable by proper means because a competitor could use it to undercut

Prairie's prices and take its customers.

66.     Welsh, Gilbertson, Drefke and Immense misappropriated Prairie's

trade secrets in the following ways: they stole Prairie's trade secrets when Welsh,

Gilbertson or Drefke were still employed by Prairie and owed Prairie duties of

confidentiality; and they have all used or disclosed Prairie's trade secrets in order

to start and operate a trucking business, knowing the information was obtained

by improper means.

67.     Pursuant to 18 U.S.C. § 1836(b)(3), Prairie is entitled to any or all of

the following relief for Defendants' misappropriation of trade secrets: (a) a

preliminary and permanent injunction preventing Defendants from using

Prairie's trade secrets and requiring Defendants to turn over any documents or

devices that contain Prairie's trade secrets; (b) damages for losses Prairie has

suffered and will suffer as a result of Defendants' misappropriation of trade

secrets, in an amount to be proven at trial; (c) disgorgement of any money

Defendants have received and will receive from the misappropriation of Prairie's

trade secrets, in an amount to be proven at trial; (d) royalties for Defendants'

improper disclosure or use of Prairie's trade secrets; (e) exemplary damages of

up to two times the amount of Prairie's actual damages because Defendants'

misappropriation was willful and malicious; and (f) an award of attorneys' fees

to Prairie because Defendants' misappropriation was willful and malicious.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS**
**UNDER MINNESOTA UNIFORM TRADE SECRETS ACT**
**(Welsh, Gilbertson, Drefke, Immense)**

68.     Prairie restates and incorporates by reference all preceding

allegations as though fully set forth herein.

69.     Welsh, Gilbertson, Drefke and Immense have misappropriated trade

secrets owned by Prairie, including but not limited to: individual customer rate

sheets, pricing models, business forecasts, insurance information, employee lists,

training guides, and vendor information.  Prairie took reasonable steps to keep

this information confidential by marking certain documents "confidential,"

limiting access to the documents, and password protecting the network and

email accounts where the documents are located.  This information has actual or

potential economic value from not being generally known or readily

ascertainable by proper means because a competitor could use it to undercut

Prairie's prices and take its customers.

70.     Welsh, Gilbertson, Drefke and Immense misappropriated Prairie's trade secrets in the following ways: they stole Prairie's trade secrets when Welsh, Gilbertson or Drefke were still employed by Prairie and owed Prairie duties of confidentiality; and they have all used or disclosed Prairie's trade secrets in order to start and operate a trucking business, knowing the information was obtained by improper means.

71.     Pursuant to Minn. Stat. §§ 325C.02-325C.04, Prairie is entitled to any or all of the following relief for Defendants' misappropriation of trade secrets: (a) a preliminary and permanent injunction preventing Defendants from using Prairie's trade secrets and requiring Defendants to turn over any documents or devices that contain Prairie's trade secrets; (b) damages for losses Prairie has suffered and will suffer as a result of Defendants' misappropriation of trade secrets, in an amount to be proven at trial; (c) disgorgement of any money Defendants have received and will receive from the misappropriation of Prairie's trade secrets, in an amount to be proven at trial; (d) royalties for Defendants' improper disclosure or use of Prairie's trade secrets; (e) exemplary damages of up to two times the amount of Prairie's actual damages because Defendants' misappropriation was willful and malicious; and (f) an award of attorneys' fees to Prairie because Defendants' misappropriation was willful and malicious.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (Welsh, Gilbertson, Drefke)

72.     Prairie restates and incorporates by reference all preceding allegations as though fully set forth herein.

73.     When Welsh, Gilbertson, and Drefke were employees of Prairie, they owed Prairie fiduciary duties of confidentiality and loyalty.

74.     While they were still employed by Prairie, Welsh, Gilbertson, and Drefke violated their fiduciary duties by: creating and building a competing business; diverting opportunities to Immense; self-dealing with Prairie; and stealing and disclosing Prairie's confidential information and trade secrets.

75.     Welsh, Gilbertson, and Drefke's breaches of their fiduciary duties have caused and will cause damages to Prairie in an amount to be determined at trial.  Prairie is also entitled to disgorge any compensation it paid to Welsh, Gilbertson, and Drefke during the period they were disloyal to Prairie.

76.     In addition to damages, Prairie is entitled to injunctive relief to prevent further irreparable harm caused by Welsh, Gilbertson, and Drefke's breaches of their fiduciary duties.

<u>COUNT IV</u>
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC**
**RELATIONS**
**(Welsh, Gilbertson, Drefke, Immense)**

77.     Prairie restates and incorporates by reference all preceding allegations as though fully set forth herein.

78.     Prairie had a number of existing and prospective customers that Welsh, Gilbertson, Drefke and Immense knew about from Welsh, Gilbertson, Drefke's employment at Prairie.

79.     Welsh, Gilbertson, Drefke and Immense have intentionally interfered with Prairie's prospective economic relations by doing business or attempting to do business with one or more of Prairie's existing or prospective customers.  Welsh, Gilbertson, Drefke and Immense's interference was tortious and/or illegal.  Indeed, the interference began during Welsh, Gilbertson, and Drefke's employment with Prairie, when they violated their fiduciary duties to Prairie by misappropriating Prairie's confidential information and diverting prospective customers away from their employer.

80.     If Welsh, Gilbertson, Drefke and Immense had not interfered, it is reasonably probable that Prairie would have done more business with existing and prospective customers.

81.     Welsh, Gilbertson, Drefke and Immense's interference has caused and will cause damage to Prairie in an amount to be determined at trial.

82.     In addition to damages, Prairie is entitled to injunctive relief to prevent further irreparable harm caused by Welsh, Gilbertson, Drefke and Immense's interference with Prairie's prospective economic relations.

## COUNT V
## TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONSHIPS
### (All Defendants)

83.     Prairie restates and incorporates by reference all preceding allegations as though fully set forth herein.

84.     Prairie had employment relationships with Welsh, Gilbertson, and Drefke.

85.     Each Defendant knew about Prairie's employment relationships with Welsh, Gilbertson, and Drefke.

86.     Each Defendant intentionally caused Welsh, Gilbertson, and Drefke to leave their employment with Prairie.

87.     Defendants had no justification for their interference with Welsh, Gilbertson, and Drefke's employment at Prairie, especially considering the interference was part of an unlawful conspiracy to start and build a competing business using Prairie's confidential information and trade secrets while Welsh, Gilbertson, and Drefke were still employed by Prairie.

88.     Defendants' interference with Welsh, Gilbertson, and Drefke's employment at Prairie has caused and will cause damages to Prairie in an amount to be determined at trial.

89.     In addition, Prairie continues to have employment relationships with other individuals.

90.     Welsh, Gilbertson, Drefke, and Immense know about Prairie's ongoing employment relationships.

91.     Welsh, Gilbertson, Drefke, and Immense have recruited multiple Prairie employees in an effort to convince them to leave Prairie and join Immense.

92.     Welsh, Gilbertson, Drefke, and Immense had no justification for interfering with Prairie's ongoing employment relationships, especially considering the recruitment started when Welsh, Gilbertson, and Drefke were still Prairie employees who owed fiduciary duties of loyalty to Prairie.

93.     Defendants should be enjoined from any further attempts to interfere with Prairie's ongoing employment relationships.

## COUNT VI
## AIDING AND ABETTING
### (All Defendants)

94.     Prairie restates and incorporates by reference all preceding allegations as though fully set forth herein.

95.    Defendants have engaged in tortious conduct, as described more fully above.

96.    Each Defendant knew the other Defendants were breaching duties to Prairie.

97.    Each Defendant substantially assisted or encouraged the primary tortious conduct.  For example: Welsh, Gilbertson, Drefke, and Darcy (upon information and belief) worked together to create and build Immense based on multiple violations of Welsh, Gilbertson and Drefke's fiduciary duties; Welsh, Gilbertson, and Drefke sent each other confidential Prairie information for Immense's use; upon information and belief, DJ Express has partnered with Immense and Darcy and/or Aladdin has provided financing to Immense, which assisted and encouraged Welsh, Gilbertson and Drefke in their quest to unfairly compete with Prairie.

98.    Defendants' aiding and abetting one another's tortious conduct has damaged and will damage Prairie in an amount to be determined at trial.

99.    In addition to damages, Prairie is entitled to injunctive relief to prevent further irreparable harm caused by Defendants continuing to aid and abet one another's tortious conduct.

## COUNT VII
## CIVIL CONSPIRACY
### (All Defendants)

100.    Prairie restates and incorporates by reference all preceding allegations as though fully set forth herein.

101.    Defendants have combined to accomplish an unlawful purpose – namely, to unfairly compete with Prairie.

102.    Defendants' civil conspiracy has damaged and will damage Prairie in an amount to be determined at trial.

103.    In addition to damages, Prairie is entitled to injunctive relief to prevent further irreparable harm caused by Defendants' civil conspiracy.

## COUNT VIII
## UNJUST ENRICHMENT
### (All Defendants)

104.    Prairie restates and incorporates by reference all preceding allegations as though fully set forth herein.

105.    Defendants have received information and other benefits from Welsh, Gilbertson, and Drefke's misconduct as Prairie employees, and it would be unjust for Defendants to keep that information and those benefits without fully compensating Prairie.

106.    Defendants have been unjustly enriched at Prairie's expense in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Prairie Field Services, LLC asks the Court to enter judgment against Defendants that includes the following relief:

1.   An injunction and other appropriate equitable relief as follows:

    a.   Prohibits Defendants Alan Welsh, Alan Gilbertson, Dustin Drefke and Immense Services, LLC ("Immense") from directly or indirectly: (a) using or disclosing any confidential information or trade secrets they or any other Defendant obtained from Prairie; (b) soliciting or providing any trucking, transportation, or logistics services to any customer of Prairie; (c) soliciting or providing any trucking, transportation, or logistics services to any prospective customer that any of them learned about when any of them was a Prairie employee; (d) soliciting or providing any trucking, transportation, or logistics services in Wyoming, Colorado, Texas, or New Mexico to anyone in the oil industry; (e) soliciting or otherwise encouraging any existing Prairie employee to terminate their employment with Prairie; (f) owning an interest in any entity, including but not limited to Immense and DJ Express, that does any of the prohibited activities described in subsections (a)-(e) of this paragraph; and (g) taking any action that in any way would encourage or assist any person engaging in any of the prohibited activities described in subsections (a)-(e) of this paragraph;

    b.   Prohibits Defendants Darcy Johnson, Scott Keogh, Aladdin Financial, Inc. ("Aladdin") and DJ Express, Inc. ("DJ Express") from directly or indirectly: (a) using or disclosing any of Prairie's confidential information or trade secrets that were obtained by or from Welsh, Gilbertson, Drefke or Immense; and (b) financing, encouraging, or otherwise assisting in any activity that would violate paragraph 1, above; and

      c.      Prohibits all Defendants from deleting or destroying any documents or information related to Prairie, Immense, or the subject matter of this lawsuit;

      d.      Requires all Defendants to: (a) return to Prairie all confidential information and trade secrets of Prairie obtained by or from Welsh, Gilbertson, Drefke or Immense; (b) turn over to Prairie all electronic devices (including hard drives, laptops, tablets, and phones) that contain information related to Prairie and/or Immense so Prairie can search and image the devices for preservation purposes and then permanently remove Prairie's confidential information and trade secrets from the devices; and (c) grant Prairie access to all email and other accounts (e.g., cloud services) that contain information related to Prairie and/or Immense so Prairie can search and copy the documents in the accounts and then permanently remove Prairie's confidential information and trade secrets from them.

2.      An award of direct, incidental and consequential damages believed to be in excess of $75,000, the exact amount to be determined at trial;

3.      An award of exemplary damages for Defendants' misappropriation of trade secrets;

4.      An award of disgorgement of all money Defendants have received as a result of their misappropriation of trade secrets;

5.      An award of disgorgement of all compensation Prairie paid to Welsh, Gilbertson and Drefke during the period of their disloyalty;

6.      An award of pre- and post-judgment interest to the fullest extent permitted by law;

7.  An award of attorneys' fees and costs to the fullest extent permitted by law; and

8.  For such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Prairie demands a jury trial on all causes of action so triable.

Dated:  October 14, 2020

**ANTHONY OSTLUND
BAER & LOUWAGIE P.A.**


 *s/ Philip J. Kaplan*
Joseph W. Anthony (#0002872)
janthony@anthonyostlund.com
Philip J. Kaplan (#0389351)
pkaplan@anthonyostlund.com
Ryan M. Lawrence (#399135)
rlawrence@anthonyostlund.com
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402
Telephone:  612-349-6969

**ATTORNEYS FOR PLAINTIFF**