## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Prairie Field Services, LLC,                    File No. 20-cv-2160 (ECT/KMM)

                    Plaintiff,

v.

Alan Welsh, Alan Gilbertson, Dustin Drefke,         **OPINION AND ORDER**
Immense Services, LLC, Darcy Johnson,
Scott Keogh, Aladdin Financial, Inc., and DJ
Express, Inc.,

                    Defendants.

Joseph W. Anthony, Philip J. Kaplan, and Ryan M. Lawrence, Anthony Ostlund Baer &
Louwagie P.A., Minneapolis, MN, for Plaintiff Prairie Field Services, LLC.

Heidi J. Bassett, John J. Steffenhagen, and Klay C. Ahrens, Hellmuth & Johnson PLLC,
Edina, MN, for Defendants Alan Welsh, Alan Gilbertson, Dustin Drefke, and Immense
Services, LLC.

Plaintiff Prairie Field Services, LLC claims that three of its former employees—

Defendants Alan Welsh, Alan Gilbertson, and Dustin Drefke—stole its confidential

business information and used it to start a competing business, Defendant Immense

Services, LLC.  Compl. ¶¶ 1–2 [ECF No. 1].  Prairie also believes that another set of

Defendants—Darcy Johnson, Scott Keogh, Aladdin Financial, Inc., and DJ Express, Inc.—

unlawfully assisted in this conduct.  *Id.* ¶ 3.  Prairie has moved for a temporary restraining

order and preliminary injunction that would, among other things, severely restrict the business activities that Welsh, Gilbertson, Drefke, and Immense may pursue.[1]   ECF No. 4.

Prairie's motion will be granted in part and denied in part.   Prairie is likely to succeed on the merits of its claim that Welsh, Gilbertson, and Drefke violated their fiduciary duties, and Prairie has shown a sufficient threat of irreparable harm resulting from these Defendants' possession of its confidential information.   Welsh, Gilbertson, and Drefke must return Prairie's information.[2]   Prairie has not shown a threat of imminent irreparable harm traceable to Immense's current business activities.   The motion will therefore be denied to the extent it seeks to bar those activities.

I

A

Prairie is a "transportation and logistics company" that hauls "oil and related products" by truck from oil fields to other destinations.   Compl. ¶ 17; Dunn Decl. ¶ 2 [ECF No. 8].   It was organized as a limited liability company in North Dakota, but its corporate headquarters is in Minnesota, and the oil fields it serves are in Wyoming, Colorado, New

---

[1]   To the extent Prairie seeks a temporary restraining order, it has not complied with Federal Rule of Civil Procedure 65(b), which sets out the requirements for an order issued without notice to the adverse party.   Defendants here have received notice and had an opportunity to respond, so Prairie's motion "will be adjudicated as one seeking only a preliminary injunction."   *Minn. RFL Republican Farmer Lab. Caucus v. Freeman*, __ F. Supp. 3d __, No. 19-cv-1949 (ECT/DTS), 2020 WL 5512509, at *1 n.1 (D. Minn. Sept. 14, 2020).

[2]   For reasons that will be explained later, rather than order specific procedures to govern the return of Prairie's information, the Parties will be ordered to negotiate in good faith in an effort to agree on these procedures.

Mexico, and Texas.  Compl. ¶¶ 5, 17; Dunn Decl. ¶ 2.  Its financial staff and most of its senior leadership, including the Chief Financial Officer, work in the Minnesota headquarters, but other employees work remotely in other states.  Dunn Decl. ¶¶ 2, 5, 16.

Understanding this case requires a brief word about the market in which Prairie operates.  When an oil company needs trucking services, it generally puts out a call for bids.  Trucking companies then compete with one another for the business.  Compl. ¶ 19; Dunn. Decl. ¶ 4; Welsh Decl. ¶¶ 7–8 [ECF No. 25].  A company like Prairie may serve the same customers more than once, but it usually does not have "exclusive contracts" with those customers.  Welsh Decl. ¶ 9.  Rather, the only way to retain customers is to keep offering attractive bids.  The bidding process has been especially "price-sensitive" during the COVID-19 pandemic because plummeting demand has resulted in a market "heavy on suppliers."  Compl. ¶ 18; Dunn Decl. ¶ 3; Welsh Decl. ¶¶ 6–7.  Now more than ever, then, a company that is unable to "remain competitive on price" is unlikely to fare well, Compl. ¶ 18; Dunn. Decl. ¶ 3, so a great deal rides on the numbers that go into bids.

When Prairie prepares its bids, it uses what it calls a "confidential pricing model that breaks down the estimated costs of the" proposed work.  Compl. ¶ 19; Dunn. Decl. ¶ 4.  Prairie has not submitted any one document that shows a master formula, but it has filed a number of documents under seal that show applications of the model for individual bids and customers.  Dunn Decl., Exs. J [ECF No. 9], N [ECF No. 9-1], AA [ECF No. 9-11].  It appears that the model combines basic, publicly available factors (*e.g.*, fuel costs, the distance between destinations, and speeds) with other, more specific factors that reflect Prairie's "knowledge of its customers' needs."  Compl. ¶ 19; Dunn Decl. ¶ 4.  According

to Prairie, the model as a whole is much more than "basic arithmetic"; it draws on "years of historical data," and recreating it would require "inside knowledge of Prairie's confidential information."  Compl. ¶ 19; Dunn Decl. ¶ 4.

B

Until recently, three of the Defendants worked for Prairie.  The first, Welsh, spent a little over four years with the company, first as its Director of Safety and then as its Chief Operating Officer.  Compl. ¶ 20; Dunn Decl. ¶ 5; Welsh Decl. ¶ 2.  Although Welsh worked out of South Dakota and thus away from the Minnesota headquarters, Compl. ¶ 6; Defs.' Mem. in Opp'n at 35 [ECF No. 24], he was a significant player in the company.  He was "ultimately responsible for every aspect of [its] operations" and either led or participated in "every major initiative at Prairie."  Compl. ¶ 21; Dunn Decl. ¶ 6.  He was also the company's "primary salesperson and [the] main contact for [its] customers." Compl. ¶ 22; Dunn Decl. ¶ 7.  With these responsibilities came "access to most of Prairie's competitive information," including financial statements and projections, "pricing, customer and vendor contacts, well locations, and management plans."  Compl. ¶ 23; Dunn Decl. ¶ 8.

Gilbertson, Prairie's former Director of Operations, was Welsh's "righthand man." Compl. ¶¶ 24–25; Dunn Decl. ¶¶ 9–10; Gilbertson Decl. ¶ 2 [ECF No. 26].  He was in charge of "manag[ing] Prairie's relationships with third-party contractors" and also "had access to almost all of Prairie's competitive information."  Compl. ¶ 25; Dunn Decl. ¶ 10. He was with the company for about five years.  Dunn Decl. ¶ 9.

Drefke was not quite as high up in Prairie's official ranks, but he still played a significant role. He was the company's "Dispatch Manager" and then its "Sales Manager," which required him to "manage[] a team of 8-10 people who worked on day-to-day trucking operations." Compl. ¶ 27; Dunn Decl. ¶ 12; Drefke Decl. ¶ 2 [ECF No. 27]. He had access to a great deal of Prairie's business information, including "individual tickets, [its] truck monitoring system, pricing, and forecasts." Compl. ¶ 28; Dunn Decl. ¶ 13.

Near the end of 2019, each of these men signed a written acknowledgement that they had received a copy of Prairie's Employee Handbook. Dunn Decl. ¶ 15, Exs. B [ECF No. 8-2], C [ECF No. 8-3], D [ECF No. 8-4]; *see also* Drefke Decl. ¶ 3; Gilbertson Decl. ¶ 3. By its own terms, the Handbook is "not a contract." Dunn Decl., Ex. A at 5 [ECF No. 8-1]. Similarly, the acknowledgement that the men signed stated that the Handbook did not "create an employment contract or term," but the employees nevertheless agreed to "comply with [its] policies." *E.g., id.*, Ex. B. Among other things, the Handbook prohibited employees from engaging in "[s]imultaneous employment" with a Prairie competitor and from "[u]sing [their] position in the company or knowledge of its affairs for personal gains." *Id.* at 10. It also warned that employees would be subject to discipline, including "legal action," if they "improperly use[d] or disclose[d] trade secrets or confidential business information." *Id.* at 11. It defined "[c]onfidential information" as "any and all information disclosed to or known by [the employee] because of employment with the company that is not generally known to people outside the company about its business." *Id.*

C

The events leading up to this lawsuit began in the early summer of 2020. In June, Welsh, Gilbertson and Drefke began to discuss the prospect of forming their own company and calling it Immense Services, LLC. Drefke Decl. ¶ 5; Gilbertson Decl. ¶ 4; Welsh Decl. ¶ 15. By June 8, they had formed "@immenseservicesllc.com" email addresses. Dunn Decl., Ex. F [ECF No. 8-6]. On June 18, they filed organizational documents with the Wyoming Secretary of State to officially form Immense. Gilbertson Decl. ¶ 4; Dunn Decl., Ex. G [ECF No. 8-7 at 49–52].

According to the current record, not much happened with Immense for the next month or so. On June 24, Gilbertson sent an email from his Immense email address to Welsh at his Prairie email address, attaching rates that Prairie had charged one of its customers for hauling water. Dunn Decl. ¶ 34, Ex. T [ECF No. 9-4]. On August 3, Welsh sent an email to a different Prairie employee, apparently seeking advice on how Immense might take advantage of an opportunity to "haul water equipment" for a company called Element Frac. Pl.'s Mem. in Supp. at 10 [ECF No. 6]; Dunn Decl., Ex. I [ECF No. 8-9]. Welsh ran this idea by Drefke, but Drefke expressed concern about Immense committing to any contracts before it had insurance. Dunn Decl., Ex. I.

Later in August, things began to accelerate. On August 17, Welsh and Drefke began working on obtaining insurance for Immense. Dunn Decl., Exs. CC [ECF No. 8-16], DD [ECF No. 8-17]. During this process, Welsh apparently discovered that Immense could get better insurance rates if it were "associated with an established company." Welsh Decl. ¶ 19. This led him to identify DJ Express, a company owned by his friend, Darcy Johnson,

as part of Immense's "management team" in a draft "vision statement" meant for the insurance underwriters. *Id.*; Dunn Decl., Ex. H [ECF No. 8-8 at 2–3].[3]

A few days later, around August 22, Welsh announced his resignation from Prairie, Dunn Decl. ¶ 5, Ex. O [ECF No. 8-13], but at Prairie's request, he agreed to stay on through the end of September to help with the transition, Welsh Decl. ¶ 20. Drefke's employment with Prairie officially ended around the same time, but he also agreed to stay on in an unofficial capacity. Dunn Decl. ¶¶ 11, 56; Drefke Decl. ¶ 7. Welsh told Prairie that he was going to work with a small trucking management company in South Dakota that would not compete with Prairie. Dunn Decl. ¶ 55. Drefke said that he would be going to work with his father at DJ Express. Dunn Decl. ¶ 56; Drefke Decl. ¶¶ 6–7. Neither Welsh nor Drefke mentioned anything about Immense. Dunn Decl. ¶ 56.

With Gilbertson still employed at Prairie and Welsh and Drefke both working in an unofficial capacity, all three still had access to their Prairie computers and email accounts during the month of September. At that point, Welsh and Drefke began sending various Prairie-related documents from their Prairie email accounts to their Immense email accounts. Welsh sent the following: a certificate of insurance belonging to Prairie, Dunn Decl. ¶ 36, Ex. V [ECF No. 9-6]; an invoice showing names of Prairie truck drivers along with the "types and costs of screening they received," *id.*, Ex. R [ECF No. 9-2]; Pl.'s Mem. in Supp. at 6; a copy of a written agreement between Prairie and a third-party contractor,

---

[3] The same document also seems to identify Defendants Keogh and Aladdin Financial as part of the Immense team, but according to Welsh, none of these four Defendants— Johnson, Keogh, DJ Express, or Aladdin—have a "formal business relationship" with Immense. Welsh Decl. ¶ 19.

Dunn Decl. ¶ 37, Ex. W [ECF No. 9-7]; and information about "projected volumes for Prairie's South Texas operations," *id.* ¶ 38, Ex. X [ECF No. 9-8]. Drefke, for his part, forwarded information about Prairie's "monthly forecasting," *id.* ¶ 35, Exs. U [ECF No. 9-5], BB [ECF No. 9-12]; several bids that Prairie had submitted to potential customers, *id.*, Exs. J, N, AA; Prairie's rate sheets for multiple customers, *id.*, Exs. AA–BB; and information about Prairie customers' expected business needs, *id.* ¶¶ 39–40, Exs. Y [ECF No. 9-9, Z [ECF No. 9-10].

Neither Welsh nor Drefke denies sending these emails, but they offer explanations for retaining Prairie-related information. According to Welsh, he had always used a company-issued computer, but once he decided to leave, he bought a personal computer and had his information copied to it from his Prairie computer "so that [he] would not lose personal data." Welsh Decl. ¶ 21. Drefke says that he would sometimes forward work emails to his personal account or Immense account because he "did not always have [his] work computer on hand" and "wanted the e-mails to be easily accessible." Drefke Decl. ¶ 9.

The record of Immense's activities tapers off around the end of September, but one more thing is worth noting. According to Prairie, Immense submitted a bid for gas-and-diesel hauling to a company called KAG Logistics on September 24. Dunn Decl. ¶ 25. Welsh, Gilbertson, and Drefke do not deny sending something to KAG, but they claim that it was not a "formal" or "legitimate[]" bid because Immense had not yet secured insurance. Welsh Decl. ¶ 23(c); Gilbertson Decl. ¶ 5. Rather, they assert that Immense is currently interested only in flatbed hauling and equipment resale—both lines of business that Prairie

8

does not pursue.  Welsh Decl. ¶ 14; Gilberston Decl. ¶ 4; Drefke Decl. ¶ 5.  But they admit that Immense is "exploring the market and [its] future options."  Welsh Decl. ¶ 23(c).

As for the three men's relationships with Prairie, things came to a head in early October.  By that point, Welsh and Drefke had left the company for good, apparently on good terms (at that time).  On October 2, Prairie's Controller, Matt Wharton, its CEO, Pat Hughes, and its CFO, Paul Dunn, heard from "a Prairie employee" that Welsh, Gilberston, and Drefke had formed Immense in order to compete with Prairie.  Dunn Decl. ¶ 16.  This tip prompted an investigation, which revealed the emails described above, some of which Drefke had attempted to delete from his Prairie account.  *Id.* ¶ 17.  Prairie then terminated Gilberston, and it "immediately engaged legal counsel to start this action."  Dunn Decl. ¶ 58.

### D

Prairie filed this lawsuit against two sets of Defendants.  Welsh, Gilberston, Drefke, and Immense are the primary Defendants, and unless otherwise noted, the remainder of this order will refer to them as the "Immense Defendants."  Prairie claims that they misappropriated its trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b), and the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. § 325C.02–.04, Compl. ¶¶ 63–71; tortiously interfered with Prairie's prospective economic advantage, Compl. ¶¶ 77–82; tortiously interfered with Prairie's employment relationships, Compl. ¶¶ 83–93; aided and abetted each other's conduct, Compl. ¶¶ 94–99; engaged in a civil conspiracy, Compl. ¶¶ 100–03; and unjustly enriched themselves at Prairie's expense, Compl. ¶¶ 104–06.  It also claims that Welsh,

Gilbertson, and Drefke (but not Immense) violated the fiduciary duties of loyalty and confidentiality. Compl. ¶¶ 72–76. The secondary Defendants are Johnson, Keogh, DJ Express, and Aladdin Financial. Against these Defendants, Prairie asserts claims of tortious interference with employment relationships, aiding and abetting, civil conspiracy, and unjust enrichment. Compl. ¶¶ 83–106.

Immediately after filing its Complaint, Prairie filed a motion for a temporary restraining order and preliminary injunction. ECF No. 4. It seeks an order enjoining the Immense Defendants from: (1) "using or disclosing" its confidential information or trade secrets; (2) "soliciting or providing any trucking, transportation, or logistics services" to current or prospective Prairie customers; (3) "soliciting or providing any trucking, transportation or logistics services in Wyoming, Colorado, Texas, or New Mexico to anyone in the oil industry"; (4) soliciting Prairie's employees; (5) assisting or owning an interest in any entity engaging in any of the previous activities; or (6) "deleting or destroying any documents or information related to Prairie, Immense," or this lawsuit. *Id.* at 1–2. It also seeks an order requiring the Immense Defendants to: (1) return all of Prairie's confidential information and trade secrets; and (2) grant Prairie access to their electronic devices and digital accounts so Prairie can "search and image the devices for preservation purposes" and ensure that its confidential information has been removed. *Id.* at 2. Finally, the motion initially sought an order enjoining Johnson and the other secondary Defendants from "directly or indirectly": (1) "using or disclosing" Prairie's confidential information or trade secrets; or (2) "financing, encouraging, or otherwise assisting in any activity" that would violate the requested injunction. *Id.*

10

Since Prairie filed its motion, a significant development has narrowed the scope of the case: Prairie reached a partial agreement with the secondary Defendants. ECF No. 28-1. Under this agreement, which is essentially a stipulated injunction, the secondary Defendants agreed that they would not, "directly or indirectly": (1) use or disclose any of the allegedly confidential information at issue in this case; (2) "finance, own any interest in, or provide any services to Immense"; (3) "finance, encourage, or otherwise assist Welsh, Gilbertson, Drefke, or Immense" in the conduct that Prairie seeks to enjoin; or (4) "intentionally delete or destroy any documents or information related to" the litigation. *Id.* at 1–2. These Defendants also agreed to: (1) examine their records, electronic devices, systems, and servers and to return any Prairie-related information that they found, "regardless of confidentiality"; (2) direct the Immense Defendants not to give them any more of Prairie's information; and (3) immediately notify Prairie if they do receive any more of its information. *Id.* at 2. In exchange for these promises, Prairie agreed to withdraw its motion for a temporary restraining order and preliminary injunction as to these Defendants. *Id.* at 2–3.[4]

## II

Before reaching the merits of Prairie's motion, it is necessary to say a word about personal jurisdiction. This is because the Immense Defendants, in their response brief,

---

[4] It is worth noting that the secondary Defendants did not concede any liability on Prairie's claims, and they reserved the right to dispute the issue of personal jurisdiction, except to the extent that Prairie seeks to enforce the terms of their limited agreement against them in this District. *Id.* at 3.

claim that Prairie "rushed to the courthouse" without "establish[ing]" the "threshold issue" of personal jurisdiction. Defs.' Mem. in Opp'n at 34–35.[5] They cite authority for the proposition that a district court "must determine as a threshold matter whether it possesses personal jurisdiction" before it may "enter legally binding orders." *Id.* (quoting *Falkirk Mining Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 372 (8th Cir. 1990)). Indeed, when a defendant challenges a court's jurisdiction at the preliminary-injunction stage, a plaintiff "must 'adequately establish that there is at least a reasonable probability of ultimate success upon the question of jurisdiction.'" *Hedberg v. State Farm Mut. Auto. Ins. Co.*, 350 F.2d 924, 929 (8th Cir. 1965) (quoting *Indus. Elecs. Corp. v. Cline*, 330 F.2d 480, 482 (3d Cir. 1964)); *see also Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1018 (10th Cir. 1990); *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir. 1985); *Visual Scis., Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 59 (2d Cir. 1981); *Khatib v. All. Bankshares Corp.*, 846 F. Supp. 2d 18, 25–26 (D.D.C. 2012).

But the Immense Defendants have not really "challenged" personal jurisdiction here. They recite the citizenship of the Parties and assert that "an injunction should not issue in a state where [] personal jurisdiction is lacking," but they include no meaningful argument on the issue. Defs'. Mem. in Opp'n at 36. Rather, they seem to place the onus on Prairie and the Court to address it. This is not what the law requires. Unlike subject-

---

[5]    The Immense Defendants also suggest that the District of Minnesota is not a proper venue and the law of some state other than Minnesota may govern the dispute. *See* Defs.' Mem. in Opp'n at 34–36. But they do not include any argument as to why venue is improper, why another state's law should apply, or how that law might differ from Minnesota law. At least at this time, then, Minnesota law will be applied, and venue will not be addressed.

matter jurisdiction, which a court must always examine on its own, lack of personal jurisdiction is an affirmative defense that a defendant must raise. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701–03 (1982) (discussing the difference between subject-matter and personal jurisdiction); *see also* 5B Arthur R. Miller, Mary K. Kane, & A. Benjamin Spencer, *Federal Practice and Procedure* § 1347 n.24 (3d ed. Oct. 2020 Update). In the cases applying a "reasonable probability" standard cited in the previous paragraph, for example, it appears that the defendants had more fully raised the jurisdictional issue, either in their answers or in motions to dismiss. *See Home-Stake Prod. Co.*, 907 F.2d at 1015; *Enter. Int'l*, 762 F.2d at 470; *Visual Scis.*, 660 F.2d at 58; *Hedberg*, 350 F.2d at 927; *Khatib*, 846 F. Supp. 2d at 25. To be sure, the Immense Defendants have indicated that they will raise the issues of personal jurisdiction, venue, and choice of law "in due course." Defs.' Mem. in Opp'n at 36. Because they have not done so at this stage, however, it is not appropriate to hold Prairie to the burden of showing a "reasonable probability" that it will ultimately prove the existence of personal jurisdiction. *Hedberg*, 350 F.2d at 929.

Moreover, Prairie has alleged at least a plausible basis for personal jurisdiction. *See Penrod v. K&N Eng'g*, No. 18-cv-2907 (ECT/LIB), 2019 WL 1958652, at *3–4 (D. Minn. May 2, 2019) (concluding that the plausibility standard from *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), apply to jurisdictional allegations); *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 775 F. Supp. 2d 790, 799 (D. Md. 2011) (applying the plausibility standard to allegations regarding personal jurisdiction). It claims that personal jurisdiction is proper because each Defendant

"engaged in tortious conduct that caused harm to Prairie in Minnesota" and because the confidential information at issue was "created in Minnesota" and "housed on servers maintained in Minnesota." Compl. ¶ 16.

Because none of the Immense Defendants appear to be "at home" in Minnesota, *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)), due process requires that each one have "sufficient 'minimum contacts' with [Minnesota] so that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *DURAG Inc. v. Kurzawski*, No. 17-cv-5325 (ECT/HB), 2020 WL 2112296, at *4 (D. Minn. May 4, 2020) (quoting *Daimler AG*, 571 U.S. at 126). These contacts must be "'actions by the defendant[s]' themselves [that] 'create a substantial connection with the forum [s]tate' and provide 'fair warning' to defendants that they may be subject to jurisdiction there.'" *Id.* (quoting *Burger King Corp. v. Ruczewicz*, 471 U.S. 462, 472 (1985)).

Prairie's factual allegations, accepted as true, make it plausible that Welsh, Gilbertson, and Drefke have formed a substantial connection with Minnesota. Prairie maintains its corporate headquarters in Minnesota, where several of its senior officers manage its finances and accounting. Compl. ¶¶ 5, 20. Each of the three men worked for Prairie for years. *Id.* ¶¶ 20, 24, 26. It is reasonable to infer that they were in regular contact with the Minnesota office and drew their paychecks from Minnesota. *Id.* ¶¶ 20–21, 25, 56–57. And they allegedly reached into Minnesota (albeit virtually) to take Prairie's confidential information. *Id.* ¶ 16. Courts in this District have found that this combination of factors can justify the exercise of specific personal jurisdiction. *See Travel Leaders*

14

*Leisure Grp. v. Cruise & Travel Experts, Inc.*, No. 19-cv-2871, 2020 WL 4604534, at *9–11 (D. Minn. Aug. 11, 2020); *Custom Conveyor Corp. v. Hyde*, 237 F. Supp. 3d 895, 900–01 (D. Minn. 2017).

The result is the same for Immense, but the reason is slightly different. Prairie does not seem to allege that Immense itself had any specific, unique contacts with Minnesota. But it is clear from Prairie's allegations that Welsh, Gilbertson, and Drefke, for all intents and purposes, *are* Immense, or at the very least are its agents. And an agent's contacts can be attributed to a principal when assessing specific personal jurisdiction. *See Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1432–33 (8th Cir. 1995); *see also Daimler AG*, 571 U.S. at 135 n.13 ("Agency relationships . . . may be relevant to the exercise of specific jurisdiction." (emphasis omitted)). This is true even when the principal has not directed or authorized the agent's actions, "so long as the principal ultimately 'support[ed], accepted, and followed through on the efforts initiated' by the agent." *Travel Leaders Leisure Grp.*, 2020 WL 4604534, at *13 (quoting *Wessels, Arnold & Henderson*, 65 F.3d at 1433). According to the Complaint, Welsh, Gilbertson, and Drefke misappropriated Prairie's confidential information and trade secrets in order to compete with Prairie through Immense. On at least one occasion, Immense allegedly submitted a bid for a project that the men had learned about through their employment with Prairie. Compl. ¶ 38(d). From this, it is reasonable to infer that Immense used Prairie's confidential pricing information, suggesting that it has "support[ed], accepted, and followed through on" the allegedly wrongful conduct of its members. *Travel Leaders Leisure Grp.*, 2020 WL 4604534, at *13–14 (citation omitted) (holding that a former employee's alleged

15

tortious misappropriation of trade secrets was a forum contact that would be imputed under an agency theory to a competing corporation that the former employee started). There is therefore at least a plausible basis to exercise personal jurisdiction over Immense, too.

All Defendants remain free to raise and litigate this issue going forward, and it may be that Prairie cannot ultimately establish personal jurisdiction. But at this early stage, and in the absence of any meaningful argument to the contrary, there is a plausible basis on which to exercise personal jurisdiction. That is enough to justify reaching the merits of Prairie's motion.

### III

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Our Eighth Circuit's oft-cited *Dataphase* decision describes the list of considerations applied to decide whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999) (citation omitted). The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc) (footnote omitted). "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins*, 346 F.3d at 844).

16

A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (internal quotation marks and citation omitted).  Although this factor uses the term "probability," the movant need not show a greater than fifty percent likelihood of success.  *Dwyer*, 294 F. Supp. 3d at 807.  And the movant "need only show likelihood of success on the merits on a single cause of action, not every action it asserts."  *Id.*  "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied."  *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).  Although Prairie has asserted eight causes of action, it has focused its briefing on seven: misappropriation of trade secrets (1) under the DTSA and (2) under the MUTSA, (3) breach of fiduciary duties, (4) tortious interference with prospective economic advantage, (5) tortious interference with employment relationships, (6) aiding and abetting, and (7) civil conspiracy.  These will be addressed in turn.[6]

1

Start with Prairie's misappropriation claims under the DTSA, 18 U.S.C. § 1836(b), and the MUTSA, Minn. Stat. § 325C.02–.03.  To prevail under either statute, Prairie must show that it had one or more "trade secret[s]" and that the Immense Defendants "misappropriat[ed]" them.  *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1016–17 (8th Cir. 2020).  Because the two statutes "share functionally equivalent

---

[6]     Prairie does not address its unjust enrichment claim in its brief, and it accordingly will not be addressed here.

definitions" of their key terms, these claims will be analyzed together. *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 967 (D. Minn. 2018); *accord MPAY Inc.*, 970 F.3d at 1017 n.1.

"The DTSA and MUTSA define a 'trade secret' as 'information' that '(1) is not generally known or readily ascertainable, (2) has value as a result of its secrecy, and (3) is the subject of reasonable efforts under the circumstances to protect its secrecy." *Prime Therapeutics*, 354 F. Supp. 3d at 967 (quoting *Dwyer*, 294 F. Supp. 3d at 807); *see* 18 U.S.C. § 1839(3); Minn. Stat. § 325C.01, subd. 5. Prairie need not "paradoxically jeopardize" its trade secrets by giving everything away just to prove they exist, *Protégé Biomedical, LLC v. Z-Medica, LLC*, 394 F. Supp. 3d 924, 939 (D. Minn. 2019) (citation omitted), but it does need to "define its alleged trade secrets with sufficient specificity," *Cambria Co. v. Schumann*, No. 19-cv-3145 (NEB/TNL), 2020 WL 373599, at *4 (D. Minn. Jan. 23, 2020) (citation omitted).

Prairie asserts that there are many trade secrets at play here—specifically, "individual customer rate sheets, pricing models, business forecasts, insurance information, employee lists, and vendor information." Pl.'s Mem. in Supp. at 24; *see* Dunn Decl. ¶ 33, Exs. J, N, R–BB. It argues that, in the context of a highly "price-sensitive" market, this information is valuable because it could allow competitors to strategically undercut Prairie's bids, thereby unfairly "capitaliz[ing] on Prairie's investments." Pl.'s Mem. in Supp. at 13; *see* Dunn Decl. ¶ 43. And, it says, it took reasonable measures to protect this information by labeling certain documents as "confidential," password-

protecting its email system and database, and limiting access to sensitive documents.  Pl.'s Mem. in Supp. at 14–15; *see* Dunn Decl. ¶¶ 44–45.

The Immense Defendants respond that the information Prairie focuses on the most—its pricing model and customer rate information—is not really protectable in the first place because all players in the oil-trucking market calculate their bids the same way: by "add[ing] up readily-identifiable costs, build[ing] in a profit margin, and bid[ding] projects accordingly."  Defs.' Mem. in Opp'n at 4.  It also argues that Prairie did not make reasonable efforts to protect its alleged trade secrets because it used "only one layer of password protection," "failed to secure confidentiality agreements with its employees, failed to segregate or secure information in its office," and left its office unlocked.  Defs.' Mem. in Opp'n at 25–26.  Finally, the Immense Defendants argue that Prairie has not shown that they "misappropriated" any of its information.  *Id.* at 26.

Assuming that the information Prairie seeks to protect is not generally known and derives value from its secrecy, Prairie's trade-secrets claims still fail.  This is because, at this early stage of the proceedings, it has not shown a likelihood that it adequately protected the information.  *See* 18 U.S.C. § 1839(3)(A); Minn. Stat. § 325C.01, subd. 5(ii).  The statutes do not require "[a]bsolute secrecy," *Wyeth v. Nat. Biologics, Inc.*, 395 F.3d 897, 900 (8th Cir. 2005), but only "reasonable steps to 'keep[] the information from those outside in the general trade or industry.'"  *Dwyer*, 294 F. Supp. 3d at 809 (quoting *Jostens, Inc. v. Nat'l Comput. Sys., Inc.*, 318 N.W.2d 691, 700 (Minn. 1982)); *see* 1 Melvin F. Jager, *Trade Secrets Law* § 5:16 (Oct. 2020 Update) (collecting cases).  And it is true that Prairie took *some* security measures.  For example, on its customer rate sheets, Prairie included

19

the label, "All pricing information is confidential."  Dunn Decl., Ex. AA [ECF No. 9-11 at 2, 34, 112]; *id.*, Ex. BB [ECF No. 9-12 at 2].  It also stored its "most sensitive financial data," including its "full rate sheet history and master pricing model," in a folder that only two people could access.  Dunn Decl. ¶ 45.

Upon closer inspection, though, Prairie's secrecy measures appear somewhat superficial.  Start with the most extreme security measure that Prairie identifies: the limited-access folder containing the company's rate sheet history and pricing model.  Strictly limiting access to protected materials can certainly indicate reasonable security measures.  *See Surgidev Corp. v. Eye Tech., Inc.*, 828 F.2d 452, 455 (8th Cir. 1987); *see also* Jager, *supra*, § 5:24 (discussing potential computer-security measures).  But Prairie admits that its senior officers disseminated this information to its employees for business use, and it says little about what it did to limit access from that point on.  There is no evidence, for example, that it was distributed to employees only on a "need-to-know basis," *Surgidev*, 828 F.2d at 455 (internal quotation marks omitted), that employees had to use a particularized password to open individual documents, or that access would expire after a given period of time.  With this context, it makes little difference that some of the documents included the label, "All pricing information is confidential."  Dunn Decl., Exs. AA–BB.  This type of general statement does little to distinguish between protected information and more general information—like distances between hauling destinations and fuel prices—that could not reasonably be considered confidential.  *See Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 902–03 (Minn. 1983) (discussing inadequate security measures).

Prairie's fallback argument—which it applies not only to its pricing model and rate sheets but also to all of the other information it seeks to protect—is that its information was "located on Prairie's network or email accounts that are password-protected." Dunn Decl. ¶ 45. Passwords, like other mechanisms to limit access to information, can signal appropriate protective efforts. *See Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, No. 17-cv-5009 (JRT/KMM), 2019 WL 7838280, at *9 (D. Minn. Sept. 12, 2019), *report and recommendation adopted in relevant part*, 2020 WL 487315 (D. Minn. Jan. 30, 2020); *Kia Motors Am., Inc. v. Autoworks Distrib.*, No. 06-cv-156 (DWF/JJG), 2007 WL 9412450, at *6 (D. Minn. July 3, 2007). But by its reference to password protection, Prairie seems to mean only that employees needed to log in to access their company computers and email accounts. *See generally* Defs.' Mem. in Opp'n at 25. There is no indication in the record that Prairie applied its digital security measures to the specific documents or classes of documents that it now seeks to protect. *See Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *3 (D. Minn. Aug. 24, 2016) (holding that a company had not shown reasonable efforts because it had not shown that its computer security precautions "specifically applied to the alleged trade secrets" and there was evidence that the security policies "may have been routinely disregarded"); *see Dwyer*, 294 F. Supp. 3d at 808 (explaining that a plaintiff under these circumstances must show a likelihood that it took measures to protect the particular information at issue); *Electro-Craft Corp.*, 332 N.W.2d at 901 (explaining that "more than an intention" to keep something secret is required (internal quotation marks omitted)). If

a basic computer-login password were enough, then every document stored on a company device would potentially be protectable.

Moreover, it is important to consider what more Prairie could have done. It did not require even its senior officers to sign nondisclosure or noncompete agreements.[7] *See, e.g.*, *Prime Therapeutics*, 354 F. Supp. 3d at 968 (identifying "confidentiality agreements" and a required "annual affirmance of ongoing confidentiality obligations" as potential reasonable efforts); *Stratasys, Inc. v. Krampitz*, No. 17-cv-5524 (DSD/HB), 2018 WL 2247265, at *3 (D. Minn. May 16, 2018); Jager, *supra* § 5:21. There is no evidence it held training sessions for employees on how to protect company trade secrets. *See Deluxe Fin. Servs., LLC v. Shaw*, No. 16-cv-3065 (JRT/HB), 2017 WL 3327570, at *3 (D. Minn. Aug. 3, 2017). No record evidence shows the measures it took to secure its facilities. *See Electro-Craft Corp.*, 332 N.W.2d at 902. Absent evidence of more stringent measures to protect its alleged trade secrets, Prairie has not shown that it is likely to succeed on its misappropriation claims against the Immense Defendants under the DTSA or the MUTSA.

## 2

Prairie next claims that Welsh, Gilbertson, and Drefke breached two fiduciary duties that they owed to it: (1) the duty of confidentiality, and (2) the duty of loyalty. Although

---

[7]   As noted above, Prairie did require its employees, including Welsh, Gilbertson, and Drefke, to sign an Employee Handbook, which stated that "[a]n employee who improperly use[d] or disclose[s] trade secrets or confidential business information [could] be subject to . . . legal action." Dunn Decl., Ex. A at 11. It does not argue that the Handbook contractually bound Defendants to keep any particular information secret, and with good reason; the Handbook explicitly says that it is "not a contract." *Id.* at 5.

Prairie treats these claims under the same heading, they are distinct and will be addressed separately.[8]

a

"[E]mployees have a common law duty not to use trade secrets *or* confidential information obtained from their employer." *Eaton Corp. v. Giere*, 971 F.2d 136, 141 (8th Cir. 1992) (emphasis added) (citing *Jostens, Inc.*, 318 N.W.2d at 701). Proving a breach of this duty depends on three elements: (1) the existence of a trade secret or confidential information; (2) acquisition of the information through a confidential relationship; and (3) use or disclosure of the confidential information. *RELCO, LLC v. Keller*, No. A13-1633, 2014 WL 2921895, at *3 (Minn. Ct. App. June 30, 2014) (citing *Jostens, Inc.*, 318 N.W.2d at 701).[9]

---

[8] The Immense Defendants, for their part, seem to address only the duty of loyalty and do not separately brief the duty of confidentiality. *See* Defs.' Mem. in Opp'n at 26–29.

[9] The law is not entirely clear whether a plaintiff must show that the defendant actually *used* the confidential information or whether it suffices to show that the information was *disclosed*. *Compare Jostens*, 318 N.W.2d at 702 (requiring proof that defendants "disclosed or used" a trade secret), *and Saliterman v. Finney*, 361 N.W.2d 175, 179 (Minn. Ct. App. 1985) ("The court properly concluded that respondent breached his common law duty not to *disclose or use* confidential information gained at the expense of his employer."), *with Eaton Corp.*, 971 F.2d at 141 ("[E]mployees have a common law duty not to *use* trade secrets or confidential information obtained from their employer."). If the duty of confidentiality prevented only the *use* of confidential information, it would seem to collapse into the duty of loyalty, and these two duties are not meant to be the same. *See Integrated Process Sols., Inc. v. Lanix LLC*, No. 19-cv-567 (NEB/LIB), 2019 WL 1238835, at *3 & n.4 (D. Minn. Mar. 18, 2019). The better answer, then, seems to be that an employee could breach the duty of confidentiality merely by disclosing the confidential information to a third party.

The precise contours of the duty of confidentiality are unclear. Some courts have described a breach of this duty as "basically the common-law version of misappropriation of trade secrets" and have analyzed it alongside trade-secrets statutes. *Reliastar Life Ins. Co. v. KMG Am. Corp.*, No. A05-2079, 2006 WL 2529760, at *3–4 (Minn. Ct. App. Sept. 5, 2006); *see Electro-Craft Corp.*, 332 N.W.2d at 903. If this were all there was to the duty, then it would serve little practical purpose, because "a claim that asserts nothing more than misappropriation or misuse of a trade secret is displaced by the Minnesota Trade Secrets Act." *Schlief v. Nu-Source, Inc.*, No. 10-cv-4477, 2011 WL 1560672, at *6 (D. Minn. Apr. 25, 2011); *see also* Minn. Stat. § 325C.07(a). But Minnesota courts have suggested that the common-law duty differs from the MUTSA in at least one key respect: it applies whether or not the confidential information at issue qualifies as a "trade secret." *Saliterman v. Finney*, 361 N.W.2d 175, 178–79 (Minn. Ct. App. 1985). Here is why the distinction matters. Whereas the statutory definition of a trade secret focuses in part on a plaintiff company's efforts to protect its information, "[c]onfidential information" for common-law purposes is simply "that which an employee knew or should have known was confidential." *Jostens, Inc.*, 318 N.W.2d at 702; *see Ahlers v. CFMOTO Powersports, Inc.*, No. 13-cv-1221 (DSD/JSM), 2014 WL 2574747, at *4 (D. Minn. June 9, 2014). In some cases, a company's efforts (or lack thereof) to protect information may be dispositive of the question whether employees have a reason to know that it is confidential. *See Electro-Craft Corp.*, 332 N.W.2d at 903. But Minnesota law seems to leave open the possibility that, under the right circumstances, information can be "confidential" even if a company has not otherwise taken reasonable measures to protect it. *See RELCO, LLC*, 2014 WL

2921895, at *6 ("Confidential information and trade secrets are not synonymous, so the [MUTSA] does not necessarily apply to all confidential information.").

Prairie has shown a likelihood that Welsh, Gilbertson, and Drefke violated the duty of confidentiality. First, they knew or should have known that at least some of the Prairie-related information they sent to or from their Immense email accounts was confidential. As noted above, Prairie labeled several of its pricing-related documents as "confidential." Dunn Decl., Ex. AA [ECF No. 9-11 at 2, 34, 112]; *id.*, Ex. BB [ECF No. 9-12 at 2]. And even for those documents that did not contain an explicit label, common sense should have come into play. In the context of the competitive bidding market in which Prairie operated, it seems only natural that it would not want to publicize the rates it was charging to haul water, *id.*, Ex. T, or its projections for anticipated volumes of business, *id.*, Exs. X, BB. What nudges this claim into a likelihood of success, however, is the evidence of Welsh, Gilbertson, and Drefke's secretive behavior. Although they claim that they never intended to conceal the existence of Immense, they also apparently never informed Prairie's senior officers about it. Dunn Decl. ¶ 56, 58. On at least one occasion, Drefke "BCC-ed" his Immense email address while sending another Prairie employee a message that contained spreadsheets with business-forecast data. Dunn Decl., Ex. U. The volume of emails containing Prairie's information increased as Welsh and Drefke were preparing to leave the company, and Drefke apparently tried to delete all Immense-related emails from his Prairie account. Dunn Decl. ¶ 17. This behavior suggests that the men knew they were dealing in confidential information, regardless of what Prairie had done to protect it.

It appears undisputed that Welsh, Gilbertson, and Drefke obtained this information through a confidential relationship, so the real question is whether they used or disclosed it. *RELCO, LLC*, 2014 WL 2921895, at *3. Prairie claims that they did so by "sending Prairie's confidential information to Immense." Pl.'s Mem. in Supp. at 28. The Immense Defendants seem to respond that, at most, they possessed the information. *See* Defs.' Mem. in Opp'n at 26.

The evidence on this point is somewhat thin. Multiple courts applying trade-secrets statutes have held that forwarding potentially confidential information to one's *own* personal email address does not constitute prohibited "use or disclosure," at least absent some express prohibition on sending such emails. *See Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1053–54 (D. Minn. 2019); *Dwyer*, 294 F. Supp. 3d at 810; *Arizant Holdings Inc. v. Gust*, 668 F. Supp. 2d 1194, 1203–04 (D. Minn. 2009). This case, however, is different in one key respect: the three men sent their emails to and from *business* accounts for an entity that was set up as a potential competitor of Prairie's. *Cf. Dwyer*, 294 F. Supp. 3d at 810 (observing that emails sent to employee's personal address had not been forwarded to or otherwise disclosed to his new employer); *Gust*, 668 F. Supp. 2d at 1203 (same). Under these circumstances, it seems fair to say that Welsh, Gilbertson, and Drefke "disclosed" confidential information to a distinct entity, Immense, that did not previously have it.

There is also evidence that the three men "used" at least some of this confidential information. On September 18, 2020, Welsh sent information to his Immense address about an opportunity to bid for a gas-and-diesel-hauling contract with a company called

26

KAG Logistics.  Dunn Decl., Ex. K.  That same day, Drefke sent a load of Prairie's pricing information to his Immense email address.  *Id.*, Ex. AA.  According to Dunn, Gilbertson then prepared a bid, which Immense submitted on September 24.[10]  Dunn Decl. ¶ 25.  The most reasonable inference to draw from this timeline is that Prairie's pricing model was used in the preparation of Immense's bid.

b

Now move to the duty of loyalty.  Under Minnesota law, "[a]n employee's duty of loyalty prohibits her from soliciting the employer's customers for herself, or from otherwise competing with her employer, while she is still employed."  *Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn. Ct. App. 1987); *see also Eaton Corp.*, 971 F.2d at 141.  This rule comes with an important caveat: employees are generally allowed to "prepare to enter into competition with [their] employer[s]" while still employed, as long as those preparations do not rise to the level of outright competition.  *Rehab. Specialists, Inc.*, 404 N.W.2d at 304.  The line between preparation and competition is not "precise," but is rather a "matter of degree."  *Id.* at 305; *see Sanitary Farm Dairies, Inc. v. Wolf*, 112 N.W.2d 42, 48–49 (Minn. 1961).

Most of what we have here is preparation.  For example, Prairie cites no authority for the proposition that simply filing organizational documents for a business, naming the business, and creating business email accounts constitutes impermissible competition

---

[10]     Welsh testified that Immense could not have submitted a "legitimate[]" bid for this job because it did not have insurance at the time.  Welsh Decl. ¶ 23(c).  But he did not deny that Immense submitted something to KAG Logistics; in fact, he admitted that Immense and its members were "exploring the market and [their] future options."  *Id.*

absent some active solicitation of customers.  *See* Pl.'s Mem. in Supp. at 9–10.  The record

shows that Welsh may have "solicited advice from another Prairie employee" on how

Immense could "get [] business" from one of Prairie's customers, but there is no evidence

that Immense pursued this opportunity while Welsh was still employed.  *Id.* at 10; Dunn

Decl., Ex. I.   Similarly, Welsh and Drefke forwarded information about business

opportunities and contact information for one of Prairie's customers to their Immense email

addresses, *see id.* Exs. J–K, M, but nothing in the record shows that they followed up on

these leads while any of the three men were still employed at Prairie.

Still, there is one indicator of outright competition, and it is the same example

highlighted above.  On September 24, Immense submitted a bid (or some other kind of

business inquiry) to KAG Logistics, even though Welsh had learned about the opportunity

through his ongoing employment with Prairie.  At the time, both he and Gilbertson were

still employed at Prairie, and Drefke was working in a consulting capacity to ease the

transition after his departure.  This is enough to show that Prairie is likely to succeed on its

claim that the men violated their duty of loyalty.[11]

---

[11]     Prairie also claims that Welsh recruited multiple Prairie employees to join Immense
while he was still employed by Prairie.  In support of this argument, Prairie submitted three
emails that Welsh sent to Prairie employees.  In the first, Welsh encouraged a Prairie
employee to call him in the future if she was unhappy with her job because he "may have
some work from home opportunities."  Dunn Decl., Ex. O.  Nothing in this email suggested
that he was starting a competing business or that he was offering to hire the employee then
and there.   The second email contains only what appears to be a draft employee
biographical statement for a Prairie employee, David Street, referring to his time at Prairie
in the past tense.  *Id.*, Ex. P.  The third, sent to Gilbertson and three other Prairie employees
on September 30, is more clear; Welsh referred to Immense by name and said that he
"want[ed] us (a group of friends) to build a trucking company of over 100 trucks."  *Id.*, Ex.
Q.  Because Prairie has shown that Welsh likely violated his duty of loyalty on other

3

Prairie next argues that it is likely to succeed on its claim that the Immense

Defendants tortiously interfered with its prospective economic advantage.  Pl.'s Mem. in

Supp. at 29.  To prevail on this claim, it must prove five elements:

> (1) The existence of a reasonable expectation of economic advantage; (2) Defendant's knowledge of that expectation of economic advantage; (3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation; (4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and (5) That plaintiff sustained damages.

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219

(Minn. 2014).  To show that an expectation of economic advantage is "reasonable," a

plaintiff must "specifically identify a third party with whom the plaintiff had a reasonable

probability of a future economic relationship."  *Gieseke*, 844 N.W.2d at 221; *see also CH*

*Bus Sales, Inc. v. Geiger*, No. 18-cv-2444 (SRN/KMM), 2019 WL 1282110, at *12 (D.

Minn. Mar. 20, 2019) (dismissing a tortious-interference claim because the plaintiff did not

"identify any specific customers or business relations it has lost, or may lose, due to [the

defendants'] conduct").

Prairie argues that it is likely to succeed on this claim because Welsh, Gilbertson,

and Drefke "divert[ed] opportunities to Immense when they owed fiduciary duties to

---

grounds, it is not necessary to decide whether this rises to the level of active competition. *See Integrated Process Sols., Inc.*, 2019 WL 12388335, at *3 (suggesting that a departing employee might violate the duty of loyalty by "soliciting [] employees" from the soon-to-be-former employer).

Prairie" and "threaten to interfere with additional corporate opportunities because they have misappropriated confidential information and trade secrets that will enable them to outbid Prairie." Pl.'s Mem. in Supp. at 29. All the record shows, however, is that Welsh, Gilbertson, and Drefke emailed themselves information about several potential business opportunities. In all but one case, the record does not show whether Immense or Prairie pursued these opportunities. And for the one bid that Immense allegedly did submit, *see* Dunn Decl. ¶ 25, we do not know whether Prairie submitted a bid, too. Without this kind of evidence, Prairie cannot show that it had a reasonable expectation of economic advantage. *See H2I Grp., Inc. v. Miller*, No. 19-cv-2870 (JRT/DTS), 2020 WL 618471, at *7 (D. Minn. Feb. 10, 2020); *see also Duty Free Ams., Inc. v. Estee Lauder Cos.*, 946 F. Supp. 2d 1321, 1338–39 (S.D. Fla. 2013) (holding that a competitive bidding process did not, in itself, show "that the solicitor probably would have entered into a contract with the plaintiff but for the defendant's interference"); *cf. Willis Elec. Co. v. Polygroup Macau Ltd. (BVI)*, 437 F. Supp. 3d 693, 713 (D. Minn. 2020) (declining to dismiss a tortious-interference claim where a plaintiff "allege[d] that it lost bids that it had expected to win from several specific current or prospective customers"). At this stage, then, Prairie has not shown that it is likely to succeed on the merits of this claim.

4

Prairie also argues, in a fairly cursory fashion, that the Immense Defendants have tortiously interfered with its employment relationships. Pl.'s Mem. in Supp. at 30. Minnesota recognizes a cause of action for tortious interference with an employment contract even when, as here, the employment contract is at-will. *See Nordling v. N. States*

*Power Co.*, 478 N.W.2d 498, 505 (Minn. 1991). To prevail, a plaintiff must show: "(1) the existence of a contract; (2) knowledge of the contract by the alleged wrongdoer; (3) intentional procurement of the contract's breach; (4) absence of justification; and (5) damages caused by the breach." *Metge v. Cent. Neighborhood Improvement Ass'n*, 649 N.W.2d 488, 500 (Minn. Ct. App. 2002) (citing *Furlev Sales & Assoc., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982)).

On this record, Prairie has not shown that it is likely to succeed on the merits. At most, the evidence shows that Welsh solicited four Prairie employees, via email, to work for Immense. Dunn Decl., Exs. O–Q. (There is serious doubt that the record even shows that much. *See supra* n.11.) For two reasons, this is not enough. First, Prairie has not identified any evidence that the Immense Defendants actually "procure[d]" a breach—that is, it does not argue that any of Prairie's employees actually terminated their employment or that the employment relationship was otherwise disrupted in any way.[12] Second, this type of mere solicitation is not typically the kind of improper interference that leads to tort liability. *See Cenveo Corp. v. S. Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1139–40 (D. Minn. 2011); *see also United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn. 1982) ("Competition is favored in the law."); Restatement (Second) of Torts § 768(1) & cmt. e (explaining that it is generally not improper to "intentionally cause[] a third person . . . not to continue an existing contract terminable at will" with one's competitor).

---

[12]   The draft business plan for Immense does identify a Prairie employee named David Street as part of Immense's "management team." Dunn Decl. Ex. H. Prairie never identifies Street as a poached employee in its argument.

5

Finally, Prairie claims that each Defendant is liable for aiding and abetting the tortious conduct of the other Defendants and for engaging in a civil conspiracy. Pl.'s Mem. in Supp. at 30–31; *see Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999) (stating the elements for aiding-and-abetting liability); *Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 824 (Minn. 1950) (defining civil conspiracy). Neither of these claims is a freestanding cause of action; instead, they are both "theor[ies] of liability under which a plaintiff can establish that a defendant is vicariously liable for some tortious act committed by another." *Leiendecker v. Asian Women United of Minn.*, 848 N.W.2d 224, 228 n.2 (Minn. 2014). Prairie has already shown that it is likely to succeed on its fiduciary-duty claims against Welsh, Gilbertson, and Drefke as individuals, so it is unnecessary to decide whether the three men could also be liable under aiding-and-abetting or civil-conspiracy theories. And because Prairie no longer seeks relief against Johnson, Keogh or their companies on this motion, there is no need to address the potential liability of those Defendants under these theories.

That leaves Immense itself. Prairie does not argue that Immense—as a distinct entity—owes it a fiduciary duty, so the fiduciary-duty claims do not establish a likelihood that Prairie will succeed against Immense. At this stage of the litigation, however, there is no need to address whether Immense could be liable for Welsh, Gilbertson, and Drefke's breach under aiding-and-abetting or conspiracy theories. Prairie does not address this issue in any depth in its brief, but even more importantly, Prairie does not argue that Immense possesses any of its confidential information separately from Welsh, Gilbertson, and

Drefke.  For all practical purposes, then, it appears that an injunction against these three men will give Prairie complete relief.

*

In sum, Prairie has shown a likelihood of success on the merits against Welsh, Gilbertson, and Drefke for breaching their fiduciary duties.  The first *Dataphase* factor therefore weighs in favor of some form of relief.  *See Dwyer*, 294 F. Supp. 3d at 807 (explaining that a movant "need only show likelihood of success on the merits on a single cause of action").

B

The second *Dataphase* factor is irreparable harm, which "occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  The harm must be "*likely* in the absence of an injunction," *Winter*, 555 U.S. at 22, "great[,] and of such imminence that there is a clear and present need for equitable relief," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996).  A plaintiff must show more than a future risk of irreparable harm; "[t]here must be a clear showing of immediate irreparable injury." *Berkley Risk Adm'rs Co. v. Accident Fund Holdings Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (internal quotation marks and citation omitted).  "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins, Inc.*, 346 F.3d at 844; *see also Gamble v. Minn. State Indus.*, No. 16-cv-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

Prairie argues that it will suffer four types of irreparable harm in the absence of an injunction: (1) the Immense Defendants will be able to use Prairie's confidential rate sheets and pricing model to undercut it in the competitive bidding process; (2) the Immense Defendants will be able to use Prairie's other confidential business information to generally "capitalize on [its] investment"; (3) having information about Prairie's customers "out in market" will hurt its goodwill with customers; and (4) the Immense Defendants' recruitment of Prairie employees will "hurt employee morale and weaken [its] important employment relationships." Pl.'s Mem. in Supp. at 33. It asserts that monetary damages cannot adequately remedy any of these harms. *Id.*; *see* Dunn Decl. ¶ 59.

The Immense Defendants offer a two-pronged response. *See* Defs.' Mem. in Opp'n at 19–21. First, they argue that Prairie has not shown any threat of irreparable harm based on their possession of its information because none of the information is really confidential at all. *Id.* at 20. They reiterate that the concept of a "pricing model" in the context of the bidding market for oil trucking is illusory because all bidders rely on the same basic factors. Second, they argue that Prairie faces no threat of irreparable harm from Immense's business activities. On this point, the Immense Defendants assert that Immense "does not actively solicit any business" and that, even if it did, it currently intends to engage only in flatbed hauling and equipment resale—both lines of business that Prairie does not pursue. *Id.* at 20–21.

For three reasons, Prairie has not shown a threat of irreparable harm based on the Immense Defendants' competitive business activities. First, Welsh testified that Immense has purchased only a small amount of equipment, has not obtained insurance coverage,

does not have any employees, and is "effectively inactive." Welsh Decl. ¶¶ 15, 18. Prairie does not present any compelling facts to rebut this testimony.[13] Second, Prairie's out-of-court agreement with the secondary Defendants seriously undermines any argument that Immense is a threat. Prairie itself asserts that it "would have been practically impossible to make Immense work without the assistance and financial backing" of Johnson, Keogh, DJ Express, and Aladdin Financial. Pl.'s Mem. in Supp. at 15. Now that these Defendants have agreed not to directly or indirectly "finance, own any interest in, or provide any services to Immense," ECF No. 28-1, any threat of real competition has likely been curtailed. Third, even if Immense did pose a competitive threat, most of the resulting harms would likely be "reparable through damages." *Prime Therapeutics*, 354 F. Supp. 3d at 975; *see also Wells Fargo Ins. Servs. USA, Inc. v. King*, No. 15-cv-4378 (PJS/JJK), 2016 WL 299013, at *8 (D. Minn. Jan. 25, 2016) ("[T]his case is about money. No historic building is going to be destroyed. No toxins are going to be released into the environment. No ship is going to leave port, never to return. King stole clients away from WFI, and the main harm that WFI suffered is lost profits on the business of those clients. By definition, lost profits are 'reparable' through money damages."). Prairie does not present any evidence to back up Dunn's conclusory assertion that money damages will be insufficient.

---

[13]    To be sure, there is reason to question the Immense Defendants' assertion that they do not intend to engage in any of the same lines of business as Prairie. They have, after all, submitted some kind of inquiry or bid on Immense's behalf for a gas-and-diesel-hauling project. Dunn Decl. ¶ 25; Welsh Decl. ¶ 23(c); Gilbertson Decl. ¶ 5. And by Welsh's own admission, Immense is "exploring the market and its future options." Welsh Decl. ¶ 23(c); *see also* Gilbertson Decl. ¶ 8. But for purposes of evaluating irreparable harm, there is a difference between Immense's someday intentions, on the one hand, and its present-day execution of them (and capacity to execute them), on the other.

*See* Dunn Decl. ¶ 59. The Immense Defendants will accordingly not be enjoined from conducting business activities at this time.

Prairie has, however, shown a threat of irreparable harm from losing its confidential information. The Immense Defendants assert that none of the information taken was confidential—or even valuable—because calculating bids is a simple, generic, and ad hoc process of adding up readily ascertainable fixed costs. Defs.' Mem. in Opp'n at 12–13, 20. But this assertion just sidesteps the crux of Prairie's argument about the value of its information: that it can use years of historical data and investment to calculate its costs in a targeted way that makes its bids competitive while still maximizing its profits. *See generally* Dunn Decl. ¶¶ 3–4. Having this kind of information out in the world creates a harm that is difficult to quantify. From Prairie's perspective, its business model is no longer its own, and it cannot rest assured that the information is safe from additional leaks—whether intentional or inadvertent. *See* Pl.'s Mem. in Supp. at 33. Even more importantly, the Immense Defendants do not seem to deny possessing Prairie's information, nor do they assert a right to keep it. In fact, some of their own factual assertions suggest that they know they shouldn't really have it. Drefke, for example, admits to deleting Immense-related emails from his Prairie computer before he turned it in (though he denies that he was trying to hide anything). Drefke Decl. ¶ 8. Welsh says that, when he left Prairie, he had data copied from his Prairie computer to a personal computer in order to "retain [his] own information," not to "take any of Prairie's confidential information." Welsh Decl. ¶ 21. The implication is that any transfer of confidential information was accidental.

Here is the upshot.  Prairie has not shown that it will suffer irreparable harm absent an order enjoining the Immense Defendants from doing business.  But the intangible harm that Prairie will suffer from the lack of control over its vital business information—combined with the Immense Defendants' implicit admission that they should not have it—weighs in favor of injunctive relief requiring the Immense Defendants to return Prairie's business information.

C

Next is the balance-of-harms factor.  This involves "assess[ing] the harm the movant would suffer absent an injunction," as well as the harm the other parties "would experience if the injunction issued."  *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015) (citation omitted).  Once again, it is necessary to draw a distinction between the two overarching components of the injunction that Prairie seeks: (1) a restraint on the Immense Defendants' business activities, and (2) the return of its confidential information.

As already noted, Prairie has not shown a threat of irreparable harm with respect to the first interest.  This is not to say that there is *no* risk of harm—the Immense Defendants could ultimately expand Immense's capacity and unfairly compete with Prairie—but it is not the type of harm that warrants an injunction at this time.  On the other hand, the harm to the Immense Defendants of an order severely curtailing their business activities would be excessive and unjustified.

The equities balance differently on the second interest. Prairie has shown irreparable harm from the loss of control over its confidential information.[14] The Immense Defendants, on the other hand, claim no interest in keeping the information. Indeed, at the hearing on Prairie's motion, the Immense Defendants (without waiving any legal arguments or defenses) indicated that they might even be open to an out-of-court resolution if Prairie were only seeking the return of its information. Under these circumstances, Prairie has shown that it is an entitled to an injunction aimed at creating a blank slate between the parties by facilitating the return of its information.

D

The fourth and final *Dataphase* factor is the public interest, which does not strongly favor either party here. At bottom, "[t]his case implicates primarily business interests, not public rights." *Prime Therapeutics*, 354 F. Supp. 3d at 975. That said, the public interest favors both the individual's general "right to labor in any occupation in which he is fit to engage," *Dwyer*, 294 F. Supp. 3d at 819 (quoting *Ultra Lube, Inc. v. Dave Peterson Monticello Ford-Mercury, Inc.*, No. C8-02-658, 2002 WL 31302981, at *6 (Minn. Ct. App. Oct. 15, 2002)), and "an industry propelled by vigorous but fair competition," *id.* (quoting *Bos. Sci. Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1042 (D. Minn. 2010)). An injunction that requires the Immense Defendants to ensure the return of Prairie's information but does not restrict their business activities will serve both of these interests.

---

[14]    It seems worth observing here that Prairie is not entirely blameless. It could have done much more to protect its business information. But this does not change the fact that, at least at this early stage, some of the information that was taken appears confidential.

IV

Given that an injunction is appropriate, the remaining question is how to tailor it. *See Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1112 (8th Cir. 2020) ("An injunction must not be broader than necessary to remedy the underlying wrong." (internal quotation marks and citation omitted)). Three considerations are especially significant.

First, the Parties have the most familiarity with the underlying facts, including the business information at issue and the devices on which it is stored. Issuing a broad, high-level directive for the Immense Defendants to return Prairie's information would only raise additional questions. For example, how will the information be identified? How will it be returned? If there are associated costs, how should they be allocated? What assurances, if any, must the Immense Defendants give that all of Prairie's information has, in fact, been returned?

Second, what information should be returned? There is no reason to believe that the record contains all of Prairie's confidential information in the Immense Defendants' possession. Moreover, simply ordering the return of "confidential" information is likely to spawn disagreement over whether individual pieces of information fall within that category.

Third, the cost associated with the review and production of electronically stored information can be quite high. *See generally In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-md-2090 (ADM/TNL), 2019 WL 413554, at *6 (D. Minn. Feb. 1, 2019) (awarding over $40,000 in costs related to e-discovery to party who asserted that the actual

costs exceed $370,000). The Parties are best situated to arrive at a compromise that accommodates all of their competing interests in proportion to the cost of these measures.

Given these considerations, the Parties will be ordered to promptly negotiate in good faith toward the orderly return of all of Prairie's confidential business-related documents and electronically stored information that Welsh, Gilbertson, and Drefke obtained in the course of their employment with Prairie and that is currently in their possession. This will give the Parties the chance to reach an agreement that is acceptable to all while also minimizing the costs of compliance with a potentially burdensome judicial order. The Parties will be required to report back on the results of their negotiations within 14 days of the issuance of this order. If they have not reached an agreement by that point, a more detailed judicial order may be appropriate. In the meantime, Welsh, Gilbertson, and Drefke will be ordered not to disclose any of Prairie's business-related information that is contained in Exhibits J, N, and R through BB of the Dunn Declaration, ECF No. 8, or other, similar Prairie-related information in their possession, to any third party.[15]

V

There is one more loose end to tie up. Typically, a court may only issue a preliminary injunction "if the movant gives security in an amount that the court considers

---

[15]   The Parties are directed to resolve as many issues as possible concerning the return of Prairie's confidential documents and electronically stored information through good-faith negotiation. Regarding those particular issues on which they are unable to reach agreement (concerning the return of information), the Parties may, but are not required to, contact the chambers of Magistrate Judge Kate M. Menendez to schedule a telephone conference to determine whether mediation might facilitate the resolution of such unresolved issues.

proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Courts have wide discretion to determine the appropriateness and amount of a bond. *See* 11A Mary K. Kane, *Federal Practice and Procedure* § 2954 (3d ed. Oct. 2020 Update). But "[c]ourts in this circuit have almost always required a bond" unless "the defendant has not objected to the failure to require a bond" or "the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016). The Immense Defendants argue that they will "incur substantial damages" if an injunction wrongfully issues, but they have not provided an estimate of those damages. Defs.' Mem. in Opp'n at 36. This is not particularly surprising, though, given that the range of potential damages flowing from an improvidently granted injunction varies widely depending on the injunction's content.

It is appropriate to require Prairie to post a bond in an amount that reflects the tailored nature of the injunction that will issue. In similar cases, courts in this District have required relatively large bonds when a party is enjoined from conducting business, *see, e.g.*, *Life Time, Inc. v. Glory Gains Gym, LLC*, No. 18-cv-1127 (DWF/DTS), 2018 WL 2539095, at *4 (D. Minn. June 4, 2018) ($200,000), but relatively small ones when the focus is on simply returning or destroying materials, *see, e.g.*, *Novus Franchising, Inc. v. AZ Glassworks, LLC*, No. 12-cv-1771 (MJD/TNL), 2012 WL 5057095, at *11 (D. Minn. Sept. 27, 2012) ($5,000), *report and recommendation adopted*, 2012 WL 5072363 (D. Minn. Oct. 18, 2012). Here, returning Prairie's information will inevitably involve more than handing over a tangible object. It could require forensic examinations or other forms

of assurances that the Immense Defendants no longer possess the information.  Prairie will therefore be required to post a bond of $10,000.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [ECF No. 4] is **GRANTED IN PART** and **DENIED IN PART** as follows**:**

1.   The Motion is **GRANTED IN PART** to the extent it seeks an order requiring Defendants Welsh, Gilbertson, and Drefke to return Plaintiff Prairie's confidential business-related information.

   a.   Plaintiff Prairie and Defendants Welsh, Gilbertson, and Drefke shall promptly negotiate in good faith to ensure the orderly return of all of Prairie's confidential business information that Welsh, Gilbertson, and Drefke obtained in the course of their employment with Prairie and that remains in their possession or control.

   b.   No later than **5:00 p.m.** on **Thursday, November 12, 2020**, the Parties shall file a joint report on the result or status of their negotiations.

   c.   Pending receipt of the Parties' joint report and further order of the Court, Defendants Welsh, Gilbertson, and Drefke shall not disclose any of Prairie's confidential business information contained in Exhibits J, N, and R through BB of the Dunn Declaration [ECF No. 8], or any similar Prairie

confidential business information in their possession or control, to any

third party.

    d.   Pending receipt of the Parties' joint report and further order of the Court,

Defendants Welsh, Gilbertson, and Drefke shall not destroy any Prairie

confidential business information in their possession or control, or any

other information related to the subject matter of this lawsuit.

2.    The Motion is **DENIED** in all other respects, including to the extent it seeks

an order enjoining Defendants Welsh, Gilbertson, Drefke and Immense from

engaging in business activities.

3.    Plaintiff shall post a bond of $10,000 with the Clerk of Court no later than

**5:00 p.m.** on **Monday, November 2, 2020**.  The amount of the bond may be

subject to reconsideration if the Parties' negotiations prove unsuccessful and

more thorough measures are ordered.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  October 29, 2020           s/ Eric C. Tostrud

                                        Eric C. Tostrud
                                        United States District Court